## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

KIMBERLY-CLARK CORPORATION;
and KIMBERLY-CLARK GLOBAL
SALES, LLC,

               *Plaintiffs*,

   v.

EXTRUSION GROUP, LLC;
EXTRUSION GROUP SERVICES LLC;
EG GLOBAL, LLC;
EG VENTURES, LLC;
MICHAEL HOUSTON; and
MICHAEL COOK,

               *Defendants*.

C.A. No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs Kimberly-Clark Corporation and Kimberly-Clark Global Sales,

LLC (collectively, "Kimberly-Clark" or "Plaintiffs"), by their attorneys Gibson,

Dunn & Crutcher LLP, state their complaint for patent infringement, trade secret

misappropriation under the Defend Trade Secrets Act of 2016 ("DTSA") and the

Georgia Trade Secrets Act of 1990 ("GTSA"), and breach of contract, against

Extrusion Group, LLC ("EG"), Extrusion Group Services LLC ("EG Services"),

EG Global, LLC ("EG Global"), EG Ventures, LLC ("EG Ventures") (collectively, "Extrusion Group"), Michael Houston, and Michael Cook as follows:[1]

## NATURE OF THE PROCEEDINGS

1.    Kimberly-Clark brings this action against its former employees Michael Houston and Michael Cook (individually referred to herein as "Former Employee Houston" and "Former Employee Cook," respectively, and collectively as the "Former Employees"), and their current employers EG, EG Services, EG Global, and EG Ventures, seeking injunctive relief and damages to redress the Former Employees' respective breaches of their Confidentiality, Nonsolicitation and Assignment of Business Ideas Agreements;[2] Extrusion Group's patent infringement; and all Defendants' individual and collective misappropriation of Kimberly-Clark's confidential and proprietary information and trade secrets.

---

[1]    Filed concurrently with this Complaint is Plaintiffs' Motion for Limited Expedited Discovery.  Plaintiffs expect to use the discovery in an anticipated preliminary injunction motion that seeks to stop Defendants' infringement and misappropriation of Kimberly-Clark's intellectual property.

[2]    During their employment with Kimberly-Clark, each of the Former Employees executed a valid and binding Confidentiality, Nonsolicitation and Assignment of Business Ideas Agreement with Kimberly-Clark (each and collectively, the "Confidentiality Agreement(s)"); true and accurate copies—executed by Former Employee Houston and Former Employee Cook—are attached as Exhibit 1 and Exhibit 2, respectively, and made a part hereof.

2.      Kimberly-Clark is one of the country's leading manufacturers of personal and professional care products.  Its operating segments include personal care (*e.g.*, diapers, baby wipes, and feminine products), consumer tissues (*e.g.*, facial and bathroom tissues, paper towels, and napkins), and professional commercial products of similar nature sold under some of the most well-known and well-loved brands, including Huggies®, Kleenex®, Scott®, Cottonelle®, and Kotex®, among others.  Employing more than 42,000 individuals worldwide, Kimberly-Clark delivers its consumer products to more than 175 countries.  It is estimated that one-quarter of the world's population uses at least one of Kimberly-Clark's products every day.  As a seller of material-based consumer goods, Kimberly-Clark devotes a significant amount of its resources to research and development, innovation, and manufacturing of the materials that go into its products.

3.      This case involves proprietary technology relating to the manufacture of nonwoven fabrics, which are used in Kimberly-Clark branded products, such as Huggies® and Kleenex®.  As the name implies, the fibers of nonwoven fabrics are bonded not by a weaving or knitting process, such as occurs with cotton or wool, but by chemical, mechanical, heat or other treatments.  Nonwoven fabrics can be made from various different types of fibers and manufacturing processes, including

wetlaid, airlaid, spunbond, meltblown, and spunlace processes, as well as combinations of these individual processes; as further explained below, "coforming" is one such combined process.  Different nonwoven processes and materials have different material characteristics, including absorbency, barrier protection, cushioning, filtering, resiliency, softness, strength, and elasticity. Manufacturers generally select the materials and manufacturing processes to fit the targeted end-product application, which may include medical and healthcare products, wipes, filters, and apparel.

4.    The specific nonwoven technologies at issue in this case are the processes and equipment developed and used by Kimberly-Clark to manufacture meltblown and coform nonwoven fabrics, as well as the fabrics themselves.

5.    Meltblown nonwoven material, as described in more detail below, refers to nonwoven material manufactured using a "meltblown/meltblowing" process.  Kimberly-Clark has over forty-five years-experience in the meltblown field, and protects its innovations through trade secrets, patents, and other intellectual property.  Meltblown nonwovens have the ability to exhibit a variety of physical attributes including enhanced filtration efficiency, good barrier properties, liquid absorption/retention properties, and/or good liquid wicking properties.  As a result of these material properties, Kimberly-Clark uses its meltblown processes to

manufacture a number of its products, including its KIMTECH® industrial cleaning and sanitizing wipes and WYPALL® industrial hand cleaning wipes. Kimberly-Clark's meltblown material is also one of several different materials used in the manufacture of its Huggies® brand baby diapers.

6.      Coform nonwoven material, as described in more detail below, refers to nonwoven material manufactured using enhanced meltblowing techniques that combine the meltblown process with the introduction of a fibrous inner material (*e.g.*, wood pulp).  Kimberly-Clark has over forty years-experience in the coform field, and protects its innovations through trade secrets, patents, and other intellectual property, including United States Patent No. 8,017,534 ("the '534 Patent"), which is asserted in this case.  Kimberly-Clark's coform materials are thick, cushy, and soft and gentle to the skin.  Coform materials have higher bulk than spunbond, meltblown, or spunlace materials and have reduced linting and enhanced cleaning properties due to its layered fibrous structure.  Through its four-plus decades of research and development efforts and expense, Kimberly-Clark has developed a coform nonwoven process that optimally balances the coform material properties for certain of its Huggies® brand baby products, including Huggies® baby wipes, materials used in its Huggies® branded diaper line of products, its Kleenex® products, and Kotex® feminine products.

7.    Given the commercial success of Kimberly-Clark's coform products in the market, others in the industry have attempted, but failed, to manufacture commercial quality coform nonwoven material.  Kimberly-Clark remains, to date, the only commercial manufacturer of coform nonwoven products.  Kimberly-Clark's competitors use nonwoven technologies other than coform to manufacture their materials-based products.

8.    Seeking to exploit their knowledge of Kimberly-Clark's technologies, Extrusion Group, with the aid of former Kimberly-Clark employees, is imminently providing to at least one Chinese company Kimberly-Clark's meltblown and coform technology that would enable the Chinese company to manufacture a competing coform product.

9.    Extrusion Group is a consulting and engineering company, formed by, and principally run by, three former Kimberly-Clark employees—Former Employee Houston, Former Employee Cook, and Kurtis Brown—who each previously worked at Kimberly-Clark's nonwoven facilities in Roswell, Georgia (Kimberly-Clark's Nonwoven Group) before leaving Kimberly-Clark.

10.    Former Employee Houston and Former Employee Cook, after leaving Kimberly-Clark, disclosed and used Kimberly-Clark's meltblown and coform manufacturing trade secrets to, and through, its current employer—Extrusion

Group.  Former Employee Cook also designed a manufacturing die—sold, or offered for sale, by Extrusion Group—that misappropriates Kimberly-Clark's trade secret meltblown technology.

11.    While employed by Kimberly-Clark, each of the Former Employees worked in positions of trust within Kimberly-Clark's Nonwoven Group, with each having access to Kimberly-Clark's highly sensitive, confidential, and proprietary information and trade secrets relating to Kimberly-Clark's meltblown and coforming technologies.  This information includes the details of the proprietary equipment and processes used to manufacture Kimberly-Clark's acclaimed products.  Kimberly-Clark has not publicly disclosed this information.  Allowing these Former Employees and Extrusion Group to use this confidential information for their individual and collective benefits provides the Former Employees and Extrusion Group with an unfair competitive advantage; allows Extrusion Group to unlawfully compete with Kimberly-Clark; and imminently threatens further disclosure of Kimberly-Clark's trade secrets, all irreparably harming Kimberly-Clark and its meltblown and coform businesses.

12.    The threat of that unfair competition is imminent and ongoing.  A company in China (Nanning Qiaohong New Materials Co., Ltd., a Chinese state-owned enterprise held by Nanning Sugar Industry Co., Ltd.) ("Nanning") has

retained Extrusion Group to supply it with equipment embodying Kimberly-Clark's patented technology and trade secrets, and to implement such equipment into at least one coform manufacturing line in China.  If Extrusion Group is not enjoined, Kimberly-Clark's patented, confidential, proprietary, and trade secret technology and processes will be replicated in China—with or without Extrusion Group's later involvement—posing a real, actual, and imminent threat to Kimberly-Clark's business.

13.    Allowing such conduct also violates the Confidentiality Agreements that each of the Former Employees voluntarily agreed to and executed—wherein the Former Employees agreed that they would "not disclose, publish or disseminate any Company Information [defined in the Confidentiality Agreement as Confidential Information and Trade Secrets], or use any Company Information for the benefit of any person or entity other than the Company [Kimberly-Clark]. . ." *See* Exhibit 1 and Exhibit 2, § 2(a).  Further, each Former Employee agreed that "[w]ith respect to Trade Secrets, my confidentiality obligations described herein shall continue even after my employment with the Company terminates (regardless of the reason for or manner of termination) and for so long as the information at issue remains a Trade Secret under applicable law." *See* Exhibit 1 and Exhibit 2, § 2(a).

14.     That Kimberly-Clark has filed this case to stop the infringing and illegal conduct of Extrusion Group and the Former Employees should come as no surprise to the Defendants.  On May 17, 2017, Kimberly-Clark had an in-person meeting with Extrusion Group.  Kimberly-Clark requested the meeting based on information it had received that Extrusion Group may be using Kimberly-Clark's proprietary technology.  During the May 17, 2017 meeting, and in subsequent correspondence, Extrusion Group acknowledged that it was aware of that technology.  However, during the May 17, 2017 meeting, and in subsequent correspondence, Extrusion Group declined to provide to Kimberly-Clark any specific design details concerning the equipment and processes it was offering to customers.  Extrusion Group, moreover, declined Kimberly-Clark's request to have independent outside counsel—at Kimberly-Clark's expense—perform an assessment of Extrusion Group's equipment and processes.  Given Extrusion Group's refusal to share its information, Kimberly-Clark has continued diligently to investigate whether Extrusion Group has violated Kimberly-Clark's patents and trade secrets, and whether the Former Employees have violated their continuing obligations of confidentiality to Kimberly-Clark.  They have.

15.     Now that Defendants' misconduct has been uncovered (although the full extent of their respective wrongdoing has yet to be discovered), Kimberly-

Clark asks this Court to put an end to the Former Employees' violation of their clear contractual Confidentiality Agreements with Kimberly-Clark, Extrusion Group's patent infringement, and the collective Defendants' ongoing and threatened misappropriation of Kimberly-Clark's trade secrets with respect to Kimberly-Clark's proprietary meltblown and coform equipment and processes.

16.     In addition to preliminary and permanent injunctive relief, Kimberly-Clark also seeks damages (lost profits and reasonable royalties), attorneys' fees and costs, double damages as to the DTSA claim and the GTSA claim, treble damages as to the patent infringement claim, and any other such relief as this Court deems just and proper.

## THE PARTIES

17.     Kimberly-Clark Corporation is a Delaware corporation having its principal place of business at 351 Phelps Drive, Irving, Texas 75038.  Kimberly-Clark Corporation has operations in the State of Georgia, including in Roswell, LaGrange, McDonough, Alpharetta, and Atlanta.

18.     Kimberly-Clark Global Sales, LLC is a Wisconsin corporation having its principal place of business at 401 North Lake Street, Neenah, Wisconsin 54956.

19.     Defendant Extrusion Group, LLC is a domestic limited liability company organized under the laws of the State of Georgia, with its company

headquarters located at 1425 Market Blvd., Ste 530-123, Roswell, Georgia 30076. Former Employee Houston is identified as the Organizer of EG in corporate documents filed with the Georgia Secretary of State.

20.    Defendant Extrusion Group Services LLC is a domestic limited liability company organized under the laws of the State of Georgia, with its company headquarters located at the same place as EG, 1425 Market Blvd., Ste 530-123, Roswell, Georgia 30076.  Former Employee Houston is identified as the Organizer of EG Services in corporate documents filed with the Georgia Secretary of State.

21.    Defendant EG Global, LLC is a domestic limited liability company duly organized under the laws of the State of Georgia, with its company headquarters located at the same place as EG, 1425 Market Blvd., Ste 530-123, Roswell, Georgia 30076.  Former Employee Houston is identified as the registered agent of EG Global in corporate documents filed with the Georgia Secretary of State.

22.    Defendant EG Ventures, LLC is a domestic limited liability company duly organized under the laws of the State of Georgia, with its company headquarters located at the same place as EG, 1425 Market Blvd., Ste 530-123,

Roswell, Georgia 30076.  Former Employee Houston is identified as the Organizer of EG Ventures in corporate documents filed with the Georgia Secretary of State.

23.    Kimberly-Clark alleges defendants EG, EG Services, EG Global, and EG Ventures are coexistent in their business operations.  If any allegation stated herein as to Extrusion Group applies solely to one of EG, EG Services, EG Global, or EG Ventures, on the basis of a Defendant's Answer hereto, such allegation as to Extrusion Group is repeated and shall refer to such entities EG, EG Services, EG Global, and EG Ventures individually, as well as collectively, as is applicable to such allegation.

24.    Defendant Michael Houston is an individual who currently resides in or near 101332 Wooten Road, Roswell, Georgia.  Former Employee Houston was employed by Kimberly-Clark from April 18, 1983 to July 1, 2009.  At the time Mr. Houston left Kimberly-Clark, his position was Product & Technology Development Technical Leader.  At all times during his employment with Kimberly-Clark, Former Employee Houston was employed at 1400 Holcomb Bridge Rd., Roswell, Georgia.  Former Employee Houston joined Extrusion Group in November 2011 and is currently the CEO of Extrusion Group.

25.    Defendant Michael Cook is an individual who currently resides in or near 1015 Summer Oaks Close 8, Roswell, Georgia.  Former Employee Cook was

employed by Kimberly-Clark from June 29, 1981 to August 31, 2006.  At the time

Cook left Kimberly-Clark, his position was Engineer VI Mechanical.  At all times

during his employment with Kimberly-Clark, Cook was employed at 1400

Holcomb Bridge Rd., Roswell, Georgia.  Former Employee Cook joined Extrusion

Group in November 2011.

## JURISDICTION AND VENUE

26.    Plaintiffs Kimberly-Clark Corporation and Kimberly-Clark Global

Sales, LLC share claims arising out of the same transaction, occurrence, or series

of transactions or occurrences and common questions of law or fact will arise in

this action, pursuant to Federal Rule of Civil Procedure 20(a)(1), because

Extrusion Group and the Former Employees' patent infringement, trade secret

misappropriation, and breaches of contract represent the same series of transactions

or occurrences that affect the rights of both plaintiffs and because factual questions

related to Extrusion Group's business activities, manufacturing processes, and die

manufacturing are common to both plaintiffs.

27.    This action arises under the Patent Laws of the United States, 35

U.S.C. § 1, *et seq.*, including 35 U.S.C. §§ 271, 281, 283, 284, and 285; the Defend

Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, *et seq.*, including 18

U.S.C. §§ 1836 and 1837; the Georgia Trade Secrets Act of 1990 ("GTSA"),

O.C.G.A § 10-1-760, *et seq*.; and breach of contract under the Laws of the State of Georgia.  This Court has subject matter jurisdiction over this case for patent infringement and misappropriation of trade secrets under the DTSA pursuant to 28 U.S.C. §§ 1331 and 1338(a).  In addition, this Court has subject matter jurisdiction over this action by virtue of 18 U.S.C. § 1836(b) and (c), because Kimberly-Clark brings a claim against Defendants' violation of federal law pursuant to the DTSA. This Court has subject matter jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1332(a), because Defendants are each a citizen of Georgia and each Kimberly-Clark plaintiff is neither a citizen of Georgia, nor has its principal place of business in Georgia, and the amount in controversy exceeds $75,000.  To the extent the Court does not have subject matter jurisdiction over any state law claim pursuant to the above, this Court has supplemental or pendant jurisdiction over any such remaining claims pursuant to 28 U.S.C. § 1367 because such claims are so closely related to Kimberly-Clark's claim for misappropriation of trade secrets under the DTSA that they form part of the same case or controversy.

28.    This Court has personal jurisdiction over all Defendants.  Each Defendant is a citizen of Georgia and resides in this District.  In addition, each Defendant individually has had continuous and systematic business contacts with the State of Georgia and in this District.  EG, EG Services, EG Global, and

EG Ventures conduct its and their businesses extensively throughout the State of Georgia, by making, shipping, distributing, offering for sale, selling, and advertising its products and/or services in the State of Georgia and this District. EG, EG Services, EG Global, and EG Ventures, directly and through subsidiaries or intermediaries, have purposefully and voluntarily placed one or more infringing products and/or services into the stream of commerce within the Northern District of Georgia. EG, EG Services, EG Global, and EG Ventures have committed acts of patent infringement within the State of Georgia and this District. Kimberly-Clark's cause of action for breach of contract against the Former Employees arise directly from all Defendants' activities in this District. Kimberly-Clark's cause of action for patent infringement and misappropriation of trade secrets under the DTSA and GTSA arise directly from each and all of Defendants' activities in this District.

29.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)-(d) and 1400(b). EG, EG Services, EG Global, and EG Ventures are organized under the laws of the state of Georgia with regular and established places of business in Georgia. Each Defendant resides in this District.

# FACTUAL BACKGROUND

30.     As described previously, the technologies at issue are equipment and processes used to manufacture meltblown and coform nonwoven materials, as well as the materials themselves.  Kimberly-Clark has used, and continues to use, its trade secret meltblown dies and its meltblown and coform trade secrets to manufacture many of its commercial products.  Kimberly-Clark has made, used, sold, offered to sell and/or imported—and continues to make, use, sell, offer for sale and/or import—its patented nonwoven materials.

### *Meltblowing Dies, Meltblowing Process, and Coforming Process*

31.     Meltblowing is a manufacturing process that uses equipment called dies (referred to herein as meltblowing or meltblown dies) that contain very small holes, through which molten thermoplastic polymers are extruded.  Air plates in the die direct convergent hot air streams, through and around the die, to attenuate the extruded fibers as they exit the small holes in the die.  The attenuated fibers are then collected onto a rolling forming surface.  The fibers self-entangle on the forming surface, creating a nonwoven material.  Described below, Kimberly-Clark's trade secret "Albury Die" is a meltblowing die.

16

32.    The image below is a schematic that generally illustrates a meltblown manufacturing process, including the meltblown die (*i.e.*, die body) extruding a fiber web onto a rolling forming surface (*i.e.*, forming wire):



33.    Kimberly-Clark's coforming manufacturing process uses two meltblowing dies angled towards a central point where the extruded meltblown polymers from the two meltblowing dies converge ("Forming Zone").



The meltblown fiber streams meet at the Forming Zone before contacting a rolling forming surface.  A third stream of fibrous material (*e.g.*, wood pulp) is introduced vertically into the Forming Zone between the thermoplastic polymer fibers extruded from the opposing meltblowing dies.  Specialized picker rolls are used to introduce the pulp from larger pulp sheets.  The configuration of the two meltblowing dies requires specialized dies with a narrow profile in the direction of travel of the rolling forming surface (like Kimberly-Clark's trade secret "Albury Die").

34.     The coforming process results in a laminate-like nonwoven material, with absorbent fibrous materials (*e.g.*, wood pulp) placed between outer layers of meltblown thermoplastic polymer fibers.  The coforming process creates a material

having a unique texture that is highly effective as a cleaning material. Described below, the '534 Patent asserted in this case claims fibrous nonwoven structures, including coform nonwoven materials, and a process of making a fibrous nonwoven structure.

35.    It took Kimberly-Clark decades of research and development to create a coform material having constant, uniform properties resulting from an inherently random process of three streams of materials (two streams of meltblown polymers; one stream of fibrous material) and other air flows converging in space before falling to a rolling surface. It is the resulting know-how and trade secrets from decades of prior research and development in this area that has enabled Kimberly-Clark to successfully manufacture coform materials—the only commercially available nonwoven material of its kind.

### The '534 Patent

36.    United States Patent No. 8,017,534 ("the '534 Patent"), entitled "Fibrous Nonwoven Structure Having Improved Physical Characteristics and Method of Preparing," was duly and legally issued by the U.S. Patent and Trademark Office on September 13, 2011, after full and fair examination. The inventors of the '534 Patent assigned all rights, title, and interest in the '534 Patent to Kimberly-Clark World Wide, Inc. Kimberly-Clark Global Sales, LLC is the

current assignee of the '534 Patent and has the sole right to sue for, collect, and receive past, present, and future damages for infringement of the '534 Patent. A true and correct copy of the '534 Patent is attached as <u>Exhibit 3</u> and made a part hereof.

37.     The '534 Patent has 28 issued claims. Claims 1 and 16 claim fibrous nonwoven structures; claims 2-15 are dependent claims depending directly from independent claim 1, and claims 17-27 are dependent claims depending directly from independent claim 16. Independent claim 28 claims a process of making a fibrous nonwoven structure. Claim 1 of the '534 Patent reads as follows:

> 1. A fibrous nonwoven structure comprising:
>
> at least one meltblown fibrous material, the at least one meltblown fibrous material having an average diameter of about 0.5 to 40 μm;
>
> at least one secondary fibrous material, wherein a weight ratio of the at least one secondary fibrous material to the at least one meltblown fibrous material is in between about 40/60 to about 90/10;
>
> wherein a basis weight of the fibrous nonwoven structure is in a range of about 20 gsm to about 500 gsm; and
>
> wherein the formation index of the fibrous nonwoven structure is greater than 70.

38.    Figure 1 of the '534 Patent (reproduced below) illustrates an exemplary apparatus that may be utilized to produce a fibrous nonwoven structure, *i.e.*, coform material, as described in the '534 Patent.



FIG. 1

As depicted in Figure 1 of the '534 Patent, the pulp sheet is identified by reference numeral 40.  A picker is identified by reference numeral 36.  The secondary fibrous material, *e.g.*, wood pulp (identified by reference numeral 32), is conveyed

toward the forming zone (reference numeral 30) through a nozzle (reference numeral 44). A pair of opposing meltblowing dies (reference numerals 16 and 18) extrude meltblown fibrous material (reference numerals 20, respectively) toward the forming zone. The rolling forming surface is identified by reference numeral 58.

39.     Kimberly-Clark has and continues to make, use, sell, and offer to sell in the United States, and import into the United States, commercial products that practice the '534 Patent.

### Kimberly-Clark's Meltblown Trade Secrets

40.     Early in the development of its nonwoven fiber lines, Kimberly-Clark procured its meltblowing dies from third-party vendors. These dies could be several feet wide in the machine direction (the direction of travel of the rolling forming surface in a meltblown or coform manufacturing process, described and depicted above).

41.     Around 1973, Kimberly-Clark initiated an extensive research and development project to overhaul its then-current meltblowing die designs and configurations and to develop internally new and improved meltblowing dies.

42.     Kimberly-Clark's years of continued research and development efforts eventually lead it, in 1997, to a new meltblowing die design with a width in

the machine direction of mere inches.  This new meltblowing die design is referred to internally at Kimberly-Clark as the "Albury Die," because the new die was first deployed by Kimberly-Clark in August 1998 at its manufacturing facility located in Albury, Australia.

43.    Former Employee Cook was instrumental in the development of the Albury Die.  In 1997, Former Employee Cook, along with Kimberly-Clark employees Bryan Haynes and Jeffrey McManus, submitted to Kimberly-Clark an "Invention Disclosure" describing the Albury Die (Kimberly-Clark Internal Docket No. 13,604) (the "Albury Die Invention Disclosure").  An exemplary schematic of the meltblowing die was provided in the Albury Die Invention Disclosure, including a die body, mounting plate, die tip, and air plates.  The Albury Die Invention Disclosure also described several other die tip cross sections that were conceived and disclosed as alternative designs within the scope of the invention. In addition to the Albury Die's significant reduction in size in the machine direction, the Albury Die Invention Disclosure further described several new and improved features and characteristics that provided improvements over other meltblowing die designs, including a significant reduction of turbulence in the converging primary air streams that attenuate the extruded polymer fibers as they exit the small holes in the die tip.

44.     In view of the commercial advantages and improvements to other meltblowing die designs, Kimberly-Clark decided not to seek patent protection for the Albury Die, and instead chose to maintain the Albury Die, and the information derived from its development, as a trade secret.

45.     Reflecting its critical nature and importance to Kimberly-Clark's nonwoven business, Kimberly-Clark awarded Former Employee Cook, Bryan Haynes, and Jeffrey McManus a Trade Secret Award in conjunction with their work in the development of the Albury Die, which included compensation.

46.     Kimberly-Clark continues to use the Albury Die in various of its manufacturing facilities worldwide, including in LaGrange, Georgia, and Corinth, Mississippi.

47.     Kimberly-Clark's next generation of meltblowing die design was the "Kimcheon Die."  Kimberly-Clark first deployed its Kimcheon Die in August 2004.  Kimberly-Clark had planned to first implement the Kimcheon Die at its Kimcheon Mill facility located in Korea, hence the code name "Kimcheon."

48.     The width of the Kimcheon Die assembly is even smaller than the Albury Die.

49.     Kimberly-Clark continues to use the Kimcheon Die in various of its manufacturing facilities worldwide.

50.     Kimberly-Clark's investment in its research and development of meltblowing die designs and configurations resulted in several other advancements to meltblowing die technology, implemented and used in, or in conjunction with, its Albury Dies and Kimcheon Dies.  Kimberly-Clark reserved and maintained the improvements generated from those investments as trade secrets.

51.     Representative examples of Kimberly-Clark's meltblowing technology trade secrets are:

- the Albury Die design and process information derived from its development;

- meltblowing die nozzle geometries ("Gap" and "Recess");

- die tip capillary geometries;

- polymer distribution chamber design;

- polymer heating chamber design;

- polymer breaker plate filtration design; and

- the meltblowing manufacturing line process specifications and parameters, including, for example:

  o business data detailing material and process specifications;

    o   the respective percentage of materials needed to manufacture various different grades of meltblown nonwoven material (*e.g.*, filtration, absorbent, garment, and barrier grades); and

    o   the polymer and primary air temperatures, pressures, and volume and flow rates.

The above, collectively and individually, are referred to herein as the "Kimberly-Clark Meltblown Trade Secrets."

52.    The Kimberly-Clark Meltblown Trade Secrets have provided Kimberly-Clark a significant competitive advantage in the manufacture of meltblown nonwoven materials, and other nonwoven materials using meltblowing technology, from cost reduction, improved material quality, higher material outputs and production rates, and improved maintenance life and process reliability.

53.    Kimberly-Clark does not sell its internally developed meltblowing dies, including the Albury Die and the Kimcheon Die, or any other machinery embodying the Kimberly-Clark Meltblown Trade Secrets, to any third party. Kimberly-Clark manufactures its internally developed meltblowing dies, and other machinery embodying the Kimberly-Clark Meltblown Trade Secrets, either internally or through a trusted third-party machining company. When Kimberly-

Clark outsources the machining of any of its internally developed meltblowing dies or other associated machinery, it requires such third parties to sign nondisclosure agreements.  Access to the Kimberly-Clark Meltblown Trade Secrets is limited to specific Kimberly-Clark authorized personnel having a need-to-know and a limited number of trusted and necessary third parties subject to nondisclosure and confidentiality agreements.

54.    Kimberly-Clark does not manufacture its meltblown nonwoven fabrics in China, nor does it use the Kimberly-Clark Meltblown Trade Secrets in China.

### Kimberly-Clark's Albury Die Design Trade Secrets

55.    Kimberly-Clark chose to maintain its Albury Die design and the information derived from its development as a trade secret.  Kimberly-Clark maintains its Albury Die design a trade secret, by, among other things, manufacturing the die internally or limiting the external manufacture of such die or its components to a trusted third-party machining company under nondisclosure agreements.  Kimberly-Clark limits access to the Albury Die design specifications to those individuals having a need-to-know for such information.

56.    Kimberly-Clark's Albury Die design and the information derived from its development are not publicly known and could not be determined through testing of Kimberly-Clark's commercial end-user products.

57.    The Albury Die design has a small size in the machine direction and, among other things, reduces turbulence in the converging primary air streams that attenuate the extruded polymer fibers as they exit the small holes in the die tip. Turbulence in the primary air streams adversely affect the quality of meltblown nonwoven materials.  As a result, the Albury Die's reduction in turbulence improves the quality of Kimberly-Clark's meltblown nonwoven materials.

58.    The Albury Die design further improves assembly and maintenance time and costs by keying the air plates to the die assembly, which sets the desired nozzle geometry parameters without further measurements and refinement.

59.    The Albury Die has provided to Kimberly-Clark significant cost benefits due to improved uniformity of the extruded polymer fibers and increased throughput, allowing machines deploying the Albury Die to run at higher rates and produce higher volumes of nonwoven product than the prior die designs.

60.    In addition, as discussed above, Kimberly-Clark's coforming manufacturing process requires specialized dies with a narrow profile in the machine direction—the Albury Die satisfies this requirement.  The Albury Die and

its small width was and is a fundamental component to Kimberly-Clark's success in its coforming manufacturing process.

61.    Kimberly-Clark has continued to maintain the Albury Die design as a trade secret.

### Kimberly-Clark's Meltblowing Die Nozzle Geometries Trade Secrets

62.    Among Kimberly-Clark's meltblowing die trade secrets that are fundamental to the manufacture and quality of Kimberly-Clark's products are the meltblowing die nozzle geometries of its reduced-size meltblowing dies; *i.e.*, the size of the "Gap" width between the bottom tips of the opposing air plates and the size of the "Recess" between the bottom tip of the die tip and the bottom tips of the opposing air plates.  Kimberly-Clark has maintained, and continues to maintain, the nozzle geometries of its reduced-size meltblowing dies as trade secrets and limits access to the nozzle geometries and machining tolerances to those individuals having a need-to-know for such information.

63.    Kimberly-Clark's Gap and Recess geometries for its reduced-size meltblowing dies are unique to the industry, are not publicly known, and could not be determined through testing of Kimberly-Clark's commercial end-user products. Kimberly-Clark's Gap and Recess geometries were optimized through significant time and expense at Kimberly-Clark.

64.    Kimberly-Clark's trade secret combination of Gap and Recess geometries in its reduced-size meltblowing dies that are used in its meltblown and coform manufacturing processes contribute to the success of its nonwoven products.

65.    Kimberly-Clark has continued to maintain its meltblowing die nozzle geometries of its reduced-size meltblowing dies as a trade secret.

### Kimberly-Clark's Meltblowing Die Tip Capillary Geometries Trade Secrets

66.    Another of Kimberly-Clark's meltblowing die trade secrets that is fundamental to the manufacture and quality of Kimberly-Clark's nonwoven material products is the die tip capillary geometries of its reduced-size meltblowing dies.  These geometries include the size of the holes from which the polymer is extruded, the length of that passage from the die tip to the polymer reservoir ("Capillary Passage"), and the diameter of the inlet from the polymer reservoir to the Capillary Passage.  Kimberly-Clark has maintained, and continues to maintain, these die tip capillary geometries as trade secrets and limits access to the die tip capillary geometries and machining tolerances to those individuals having a need-to-know for such information.

67.    Kimberly-Clark's die tip capillary geometries for its reduced-size meltblowing dies are not publicly known, and could not be determined through

testing of Kimberly-Clark's commercial end-user products.  Kimberly-Clark's die

tip capillary geometries were optimized through significant time and expense at

Kimberly-Clark.

68.     Kimberly-Clark's trade secret die tip capillary geometries used in its

reduced-size meltblowing dies contribute to the success of its nonwoven products.

The die tip capillary geometries reduce turbulence in the extruded polymer and

work in conjunction with other of the Kimberly-Clark Meltblown Trade Secrets to

improve uniformity of the extruded polymer fibers and increased throughput,

allowing Kimberly-Clark's reduced-size meltblowing dies to run at higher rates

and produce higher volumes of nonwoven product.

69.     Kimberly-Clark has continued to maintain its meltblowing die tip

capillary geometries for its reduced-size meltblowing dies as a trade secret.

### Kimberly-Clark's Polymer Distribution Chamber Trade Secrets

70.     Kimberly-Clark's polymer distribution chamber design is a trade

secret that Kimberly-Clark developed to use in conjunction with its reduced-size

meltblowing dies, and is a fundamental component to the overall meltblowing die

designs.  Kimberly-Clark has maintained, and continues to maintain, its polymer

distribution chamber design as a trade secret, by, among other things,

manufacturing the polymer distribution chamber internally or limiting the external

manufacture of such polymer distribution chamber to a trusted third-party machining company under nondisclosure agreements.  Kimberly-Clark limits access to its polymer distribution chamber design specifications to those individuals having a need-to-know for such information.

71.    Kimberly-Clark's polymer distribution chamber design for its reduced-size meltblowing dies is not publicly known and could not be determined through testing of Kimberly-Clark's commercial end-user products.  Kimberly-Clark's polymer distribution chamber design was developed through significant time and expense at Kimberly-Clark.

72.    Kimberly-Clark's polymer distribution chamber design used in its reduced-size meltblowing dies contribute to the success of its nonwoven products. The polymer distribution chamber design creates a smaller footprint of the meltblowing die assembly, while maintaining uniform polymer distribution across the length of the die (perpendicular to the machine direction; in some instances, as long as eleven or more feet long).  Kimberly-Clark's polymer distribution chamber design also improves maintenance process reliability when performing maintenance on the meltblown die assembly.

73.    Kimberly-Clark has continued to maintain its polymer distribution chamber design as a trade secret.

### *Kimberly-Clark's Polymer Heating Chamber Trade Secrets*

74.    Kimberly-Clark's polymer heating chamber design is a trade secret that Kimberly-Clark developed to use in conjunction with its reduced-size meltblowing dies, and is another fundamental component to the overall meltblowing die designs.  Kimberly-Clark has maintained, and continues to maintain, its polymer heating chamber design as a trade secret, by, among other things, manufacturing the polymer heating chamber internally or limiting the external manufacture of such polymer heating chamber to a trusted third-party machining company under nondisclosure agreements.  Kimberly-Clark limits access to its polymer heating chamber design specifications to those individuals having a need-to-know for such information.

75.    Kimberly-Clark's polymer heating chamber design for its reduced-size meltblowing dies is not publicly known and could not be determined through testing of Kimberly-Clark's commercial end-user products.  Kimberly-Clark's polymer heating chamber design was developed through significant time and expense at Kimberly-Clark.

76.    Kimberly-Clark's polymer heating chamber design used in its reduced-size meltblowing dies contribute to the success of its nonwoven products. The polymer heating chamber design results in lower manufacturing costs, creates

a smaller footprint of the meltblowing die assembly, and reduces complexity resulting in lower maintenance costs.

77.    Kimberly-Clark has continued to maintain its polymer heating chamber design as a trade secret.

### Kimberly-Clark's Polymer Breaker Plate Filtration Design Trade Secrets

78.    Kimberly-Clark's polymer breaker plate filtration design is a trade secret that Kimberly-Clark developed to use in conjunction with its reduced-size meltblowing dies, and is another fundamental component to the overall meltblowing die designs.  Kimberly-Clark has maintained, and continues to maintain, its polymer breaker plate filtration design as a trade secret, by, among other things, manufacturing the polymer breaker plate filtration components internally or limiting the external manufacture of such polymer breaker plate filtration components to a trusted third-party machining company under nondisclosure agreements.  Kimberly-Clark limits access to its polymer breaker plate filtration design specifications to those individuals having a need-to-know for such information.

79.    Kimberly-Clark's polymer breaker plate filtration design for its reduced-size meltblowing dies is not publicly known and could not be determined through testing of Kimberly-Clark's commercial end-user products.  Kimberly-

Clark's polymer breaker plate filtration design was developed through significant time and expense at Kimberly-Clark.

80.    Kimberly-Clark's polymer breaker plate filtration design used in its reduced-size meltblowing dies provides a competitive advantage for its manufacturing lines using this technology.  The polymer breaker plate filtration design has a greater filtration surface area that increases the die tip life of the meltblown dies incorporating this technology, resulting in cost and maintenance efficiencies.

81.    Kimberly-Clark has continued to maintain its polymer breaker plate filtration design as a trade secret.

### Kimberly-Clark's Meltblowing Manufacturing Line Specifications and Parameters Trade Secrets

82.    Kimberly-Clark further maintains its meltblowing manufacturing line specifications and parameters as a trade secret by, among other things, restricting access to such information to Kimberly-Clark employees necessary for the operation of Kimberly-Clark's meltblowing manufacturing lines.  There are several material, air, and process specifications that must be balanced in order to manufacture a high-quality meltblown nonwoven material, including the polymer and primary air temperatures, pressures, and volume and flow rates.  These parameters vary according to the desired grade of meltblown material intended for

production (alone and in combination with other processes).  Kimberly-Clark has

identified, through significant effort and expense, business data identifying the

material and process specifications optimized for the production of differing

material uses on its meltblowing manufacturing lines.  This information is

memorialized in the Process Specification documents issued for its meltblowing

manufacturing lines.  Access to each Process Specification is restricted to

Kimberly-Clark employees necessary for the operation of Kimberly-Clark's

meltblowing manufacturing lines.

83.    Kimberly-Clark's meltblowing manufacturing line specifications and

parameters memorialized in its controlled Process Specifications are highly

valuable trade secrets enabling Kimberly-Clark to manufacture nonwoven

materials at optimal throughputs for desired applications, and to quickly modify its

manufacturing line specifications to produce other materials for alternative uses.

84.    Kimberly-Clark has continued to maintain its meltblowing

manufacturing line specifications and parameters as a trade secret.

### Former Employee Cook's Access to
### Kimberly-Clark's Trade Secrets

85.    Kimberly-Clark repeats and realleges paragraphs 1 through 84 as if

fully set forth herein.

86. Former Employee Cook had access to, and did receive, during the course of his employment at Kimberly-Clark, the Kimberly-Clark's Meltblown Trade Secrets.

87. Former Employee Cook was intimately involved in the development of the Albury Die, and the information derived from its development. Kimberly-Clark awarded Former Employee Cook a Trade Secret Award in conjunction with his work in the development of the Albury Die, reflecting its critical nature and importance to Kimberly-Clark's nonwoven business line.

88. Former Employee Cook was involved in Kimberly-Clark's further development and commercial implementation of the Albury Die and the Kimcheon Die, each of which further utilized and implemented other of the Kimberly-Clark Meltblown Trade Secrets, including the meltblowing die nozzle geometries, the die tip capillary geometries, the polymer distribution chamber design, the polymer heating chamber design, the polymer breaker plate filtration design, and the meltblowing manufacturing line process specifications and parameters.

89. Former Employee Cook had further access to Kimberly-Clark's Meltblown Trade Secrets through Kimberly-Clark's engineering database of engineering drawings. Immediately before his departure from Kimberly-Clark, Former Employee Cook reviewed or downloaded hundreds of engineering

documents and drawings from Kimberly-Clark's database. These documents include detailed machine fabrication and assembly drawings for several of Kimberly-Clark's meltblowing dies, including the Albury Die and Kimcheon Die, used in Kimberly-Clark's meltblown, spunbond, SMS, and coform processes. These machine fabrication drawings accessed by Former Employee Cook included all the details necessary to fabricate and assemble the meltblowing dies, including dimensions, machining tolerances and surface finishing requirements. The machine fabrication and engineering drawings accessed by Former Employee Cook in advance of his departure from Kimberly-Clark contained the Kimberly-Clark Meltblown Trade Secrets, including the Albury Die design; meltblowing die nozzle geometries; die tip capillary geometries; polymer distribution chamber design; polymer heating chamber design; and the polymer breaker plate filtration design.

90.     During his employment at Kimberly-Clark, Former Employee Cook had access to, and did receive, the Process Specification documents issued for several of Kimberly-Clark's meltblowing manufacturing lines. These Process Specification documents included the Kimberly-Clark meltblowing manufacturing line specifications and parameters discussed above.

91.    Kimberly-Clark continues to use the Kimberly-Clark Meltblown Trade Secrets, all of which Kimberly-Clark developed and implemented before August 31, 2006, when Former Employee Cook left Kimberly-Clark.

92.    Kimberly-Clark continues to maintain the Kimberly-Clark Meltblown Trade Secrets as trade secrets through the filing of this Complaint.

### Kimberly-Clark's Coform Trade Secrets

93.    Kimberly-Clark is the only commercial manufacturer of coform nonwoven materials.  Many competing nonwoven material technologies exist, but only Kimberly-Clark has developed, through significant research and development efforts and expense, a coform nonwoven process that is optimally suited for the commercial products Kimberly-Clark manufactures, including, but not limited to, its Huggies® and Kleenex® wipes and Kotex® feminine products.

94.    The coform process, which combines polymeric meltblown fibers and wood pulp fibers, results in a thicker material having a pillow-like consistency that is gentle to the skin, making it perfectly suited for personal care and medical applications.

95.    Other types of nonwoven material processes include, but are not limited to, wetlaid, airlaid, spunbond, spunlace, traditional meltblown, and carded. For example, Proctor & Gamble's products branded under the Pampers® product

brand name, including the Pampers® baby wipes, are manufactured using spunlace manufacturing processes.

96.   Kimberly-Clark's coform nonwoven materials have superior cleaning properties over other nonwoven materials, such as spunlace.

97.   Kimberly-Clark manufactures all of its coform nonwoven materials within Kimberly-Clark manufacturing facilities around the world, including in Conway, Arkansas and Maumelle, Arkansas.

98.   Kimberly-Clark does not manufacture its coform nonwoven materials in China.

99.   Except as embodied in Kimberly-Clark's commercial coform nonwoven consumer end products (*e.g.*, Huggies® baby wipes), Kimberly-Clark does not sell its finished coform nonwoven materials to third parties.

100.   Kimberly-Clark does not sell its coform equipment to third parties.

101.   Kimberly-Clark's coform nonwoven success is the result of Kimberly-Clark's confidential and proprietary know-how in developing and refining certain key, specific aspects of its coforming process—the details of which Kimberly-Clark has reserved and maintained as trade secrets.

102.   Representative examples of Kimberly-Clark's coforming technology trade secrets are:

- its confidential and proprietary pulp sheet specifications, including the materials and the humidity at which the pulp sheets are formed and maintained until introduced into the coforming manufacturing process line, and the optimal size of the pulp sheets designed to work in conjunction with the sizing of its Fiberizer assembly (described herein);

- the roller arrangement (*e.g.*, pulp sheet feeds) and associated machinery used to feed pulp sheets into the picker roll overcoming significant process complications;

- the picker roll specification and design, including the optimal size, shape, and spacing of the picker roll teeth;

- the picker roll operating parameters, including the pressure, temperature, and humidity parameters used under optimal operation; and

- the coforming manufacturing line specifications and parameters where the pulp, meltblown extruded polymers, and air systems come together to create the coform nonwoven material, and in particular, the material throughput speeds and temperatures, air throughput speeds and temperatures, material ratios, and positioning and dimensions of the associated machine components, including the meltblown dies and the pulp nozzle.

The above, collectively and individually, are referred to herein as the "Kimberly-Clark Coform Trade Secrets."

103.   The end product of Kimberly-Clark's proprietary coforming process, using the Kimberly-Clark Coform Trade Secrets, results in a material with combined strength, flexibility, softness, and functionality ideal for Kimberly-Clark's commercial coform nonwoven consumer end-products (*e.g.*, Huggies® baby wipes).

104.   Access to the Kimberly-Clark Coform Trade Secrets is limited to specific Kimberly-Clark authorized personnel having a need-to-know and a limited number of trusted and necessary third parties subject to nondisclosure and confidentiality agreements.

### Kimberly-Clark's Pulp Sheet Specification Trade Secrets

105.   Kimberly-Clark maintains its trade secret pulp sheet specifications by purchasing, for all of its worldwide coforming operations, from two trusted suppliers a specialty-grade blend of pulp materials and additives, at specific widths, manufactured with a specific moisture content, which is unique for Kimberly-Clark's coforming process.  Kimberly-Clark's pulp formulation, and its sheet specifications and sizing are not publicly known, and could not be determined through testing of Kimberly-Clark's commercial end-user products.

Kimberly-Clark's trade secret pulp sheet specifications are essential when used in conjunction with other of the Kimberly-Clark Coform Trade Secrets to manufacture its commercial coform nonwoven consumer end products.

### *Kimberly-Clark's Fiberizer Specification Trade Secrets*

106.   Kimberly-Clark maintains its trade secret roller arrangement and picker roll specification and design by, among other things, limiting the picker roll manufacturing to one trusted manufacturer and one third-party engineering company for the complete Fiberizer manufacture and assembly.  The Fiberizer assembly includes the picker roll and roller arrangement, among other mechanisms.  Kimberly-Clark requires and each of the above-referenced third parties has agreed to maintain Kimberly-Clark's picker roll specifications and Fiberizer assembly design specifications as confidential.

107.   Kimberly Clark continues to use its Fiberizer assemblies in various of its manufacturing facilities worldwide.  Each Fiberizer assembly has over one thousand individual parts, with each part having its own specific detailed part drawings, with certain part drawings having tolerances to the ten thousandth of an inch.  To maintain the Fiberizer design and specifications as trade secrets, among other things, access to the Fiberizer engineering and assembly drawings are maintained only at Kimberly-Clark coforming manufacturing plants and at its one

engineering company that assembles Kimberly-Clark Fiberizers.  Access to Kimberly-Clark's Fiberizer engineering and assembly drawings at that one third-party assembler is further restricted to within an isolated and controlled Kimberly-Clark workspace.

108.   Kimberly-Clark's picker roll specifications and Fiberizer assembly design specifications are not publicly known and could not be determined through testing of Kimberly-Clark's commercial end-user products.

109.   Kimberly-Clark's trade secret roller arrangement is an essential feature to its Fiberizer assembly, designed over many years to overcome manufacturing hurdles associated with regulating the controlled input of the pulp sheets into the Fiberizer assembly, which is necessary to the commercial manufacture of coform nonwoven materials.

110.   Kimberly-Clark's trade secret picker roll specification and design, including the optimal size, shape, and spacing of the picker roll teeth, is an essential feature of Kimberly-Clark's coforming manufacturing process, optimized to result in desired fiberized (shredded) pulp properties and manufacturing longevity with significantly reduced maintenance and repair services.

### Kimberly-Clark's Fiberizer Operating Parameter Trade Secrets

111.   Kimberly-Clark maintains its trade secret picker roll operating parameters, including the pressure, temperature, and humidity parameters used under optimal operation, by, among other things, restricting access to such information to Kimberly-Clark employees necessary for the operation of Kimberly-Clark's coforming manufacturing lines.  Kimberly-Clark's trade secret picker roll operating parameters are essential to the coforming process.  If the correct pressure, temperature, and humidity parameters are not used during the coforming manufacturing process, pulp fibers can migrate into undesired areas of the Fiberizer assembly, causing clumps in the finished coform nonwoven material sheet.  The operating air humidity also affects undesired clumping properties of the fiberized (shredded) pulp.  The operating pressures affect the volumes and flow rate that can be achieved during the coforming manufacturing process.  The temperature of the pulp that is fed into the coform process and opposing meltblown die polymer extrusions affects the quenching parameters of the meltblown extruded fibers.

### Kimberly-Clark's Coforming Manufacturing Line Specifications and Parameters Trade Secrets

112.   Kimberly-Clark further maintains its coforming manufacturing line specifications and parameters where the pulp, meltblown extruded polymers, and

air systems come together at the Forming Zone as a trade secret by, among other things, restricting access to such information to Kimberly-Clark employees necessary for the operation of Kimberly-Clark's coforming manufacturing lines. The air flow rates around the pulp fiberization process must be balanced with the air flow surrounding the meltblown extruded fibers in order to combine the material streams into a coform material with a uniform consistency. If the air streams do not mix completely, non-uniform areas of pulp and meltblown extruded polymer will result in inconsistent coform material. Such inconsistent coform material affects the aesthetics, overall sheet appearance, and tensile strength. For example, an improper balance of air flow can cause the meltblown extruded polymer strands to insufficiently entangle with adjacent fibers, resulting in a finished coform nonwoven sheet having an undesirably low cross-direction tensile strength with additional effects on other sheet attributes. Unbalanced air flow rates can also result in less than ideal pulp capture or bonding of the pulp with the meltblown extruded polymers. The improper positioning and/or dimensions of the meltblown dies and the pulp nozzle can further result in meltblown polymer strands not combining with the pulp to coform the desired material, and the imbalance of air flows and temperatures in association with the meltblown polymer

flow rates can result in polymer fibers becoming detached from the flow stream

and are not captured in the coform material.

### Former Employee Houston's Access to Kimberly-Clark's Trade Secrets

113.   Kimberly-Clark repeats and realleges paragraphs 1 through 112 as if

fully set forth herein.

114.   Former Employee Houston had a prominent role in Kimberly-Clark's

implementation of the Kimberly-Clark Coform Trade Secrets.

115.   During his employment at Kimberly-Clark, Former Employee

Houston worked on Kimberly-Clark's coform manufacturing line in Conway,

Arkansas, and was responsible for the construction and implementation of

Kimberly-Clark's coforming manufacturing line located at Maumelle, Arkansas.

116.   During his employment at Kimberly-Clark, Former Employee

Houston had access to engineering, assembly, and design specification drawings

for the entire Maumelle, Arkansas, coforming manufacturing plant, which includes

detailed specifications of Kimberly-Clark's meltblowing and coforming

technology.  For example, during the time that Mr. Houston was responsible for

the construction and implementation of Kimberly-Clark's coforming

manufacturing line located at Maumelle, Arkansas, he received the plant Design

Package Release, which included the engineering documents related to the

equipment, process parameters, and installation necessary to construct the coforming line.  Mr. Houston also received the Maumelle coform Process Specification, which included, in addition to the process parameters and machine configurations, details of the materials used in the coforming process (including the wood pulp specifications) and detailed equipment specifications (including those of the meltblowing dies and the Fiberizer).

117.   Former Employee Houston had access to, and received, during the course of his employment at Kimberly-Clark, the Kimberly-Clark Coform Trade Secrets, including, but not limited to, those described above.  Former Employee Houston's knowledge of the Kimberly-Clark Coform Trade Secrets arose also, for example, through his access to Kimberly-Clark's document database.

118.   Kimberly-Clark continues, as of the date of this Complaint, to use each and all of the Kimberly-Clark Coform Trade Secrets that it had optimized and implemented prior to July 1, 2009, when Former Employee Houston left Kimberly-Clark, including at its coform manufacturing facilities located at Conway, Arkansas, and Maumelle, Arkansas.

119.   Kimberly-Clark continues to maintain each and all of the Kimberly-Clark Coform Trade Secrets a trade secret through the filing of this Complaint.

***Kimberly-Clark's Efforts to Maintain the Secrecy of Its Trade Secrets***

120.   Kimberly-Clark repeats and realleges paragraphs 1 through 119 as if fully set forth herein.

121.   Kimberly-Clark has taken reasonable measures, including those reasonable under the circumstances, to keep the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets a secret.  The Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets are not commonly known by, or available to, the public.

122.   Kimberly-Clark implements its Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets within Kimberly-Clark-owned-and-operated manufacturing facilities.  Access to such facilities are limited to specific Kimberly-Clark authorized personnel and a limited number of trusted and necessary third parties (referenced in the preceding paragraphs) subject to nondisclosure and confidentiality agreements.  When such trade secrets are disclosed to limited, trusted third parties (referenced in the preceding paragraphs), such disclosures to third parties are necessary to Kimberly-Clark's operations and such third parties are contractually obligated to strict nondisclosure requirements.

123.   To protect its business interests, the confidentiality of its business operations, and the secrecy of the Kimberly-Clark Meltblown Trade Secrets and

the Kimberly-Clark Coform Trade Secrets, Kimberly-Clark has taken affirmative measures, including the utilization of restrictive covenants in its employment contracts, computer user ID and passwords protection and firewalls, limiting access to information safeguards and other measures, and restricting unauthorized use of data. The restrictive covenants in Kimberly-Clark's employment contracts are negotiated with each employee as part of their employment and include a combination of clauses concerning confidential information and trade secrets. Each restrictive covenant is limited in scope to protect both Kimberly-Clark's legitimate business interests and trade secrets while preventing undue hardship on the employee in his or her pursuit of employment in his or her area of expertise.

124.   As it does with all employees who are exposed to Kimberly-Clark's confidential and proprietary information and trade secrets in the way that the Former Employees were, Kimberly-Clark required the Former Employees to sign a Confidentiality Agreement as a condition of their employment.

125.   Former Employee Houston signed a Confidentiality Agreement (Exhibit 1) as a condition of his employment by Kimberly-Clark, "the compensation and benefits provided to [him], the Company's agreement to provide [him] with access to the Company's Confidential Information and Trade Secrets,

access to its customers, and the other promises made" therein.  Former Employee

Houston executed his Confidentiality Agreement (Exhibit 1) on June 27, 2005.

126.   Former Employee Cook signed a Confidentiality Agreement

(Exhibit 2) as a condition of his employment by Kimberly-Clark, "the

compensation and benefits provided to [him], the Company's agreement to provide

[him] with access to the Company's Confidential Information and Trade Secrets,

access to its customers, and the other promises made" therein.  Former Employee

Cook executed his Confidentiality Agreement (Exhibit 2) on June 3, 2005.

127.   Each of the Former Employees' respective executed Confidentiality

Agreements state that:

> The Company agrees to provide me with Company Information. . . . I shall not disclose, publish or disseminate any Company Information, or use any Company Information for the benefit of any person or entity other than the Company, except as specifically required to perform my job duties for the Company or as otherwise specifically authorized by the Company.  I understand and agree that one of my important duties as an employee, and even after my employment terminate, regardless of the reason for or manner of termination, is to use my best efforts to safeguard the confidentiality of the Company Information. . . . With respect to Trade Secrets, my confidentiality obligations described herein shall continue even after my employment with the Company terminates (regardless of the reason for or manner of termination) and for so long as the information at issue remains a Trade Secret under applicable law.

*See* Exhibit 1 and Exhibit 2, § 2(a).

128.    Each of the Former Employees' respective executed Confidentiality Agreements define "Company Information" to mean "Confidential Information and Trade Secrets, collectively, as defined below." *See* <u>Exhibit 1</u> and <u>Exhibit 2</u>, § 1(c).

129.    As defined in the Confidentiality Agreements, "Trade Secrets" is coextensive with trade secrets under the DTSA and GTSA. *See* <u>Exhibit 1</u> and <u>Exhibit 2</u>, §§ 1(e), 1(g).

130.    Each of the Former Employees' respective executed Confidentiality Agreements further state that:

> I further agree that all Company Information is the exclusive property of the Company and that I have no rights in or to the Company Information upon the termination of my employment.  Upon termination of my employment, regardless of the reason for or manner of termination, I agree to immediately deliver to the Company all originals and all electronic and paper copies of all documents, records and property of any nature whatsoever which are in my possession, custody or control, and which are the property of the Company or which relate to the Company Information or Business Ideas, including, but not limited to, business activities, customers or prospective customers of the Company, whether prepared by me or others.  After returning any electronic copies of such documents to the Company, any remaining electronic versions shall be destroyed.

*See* <u>Exhibit 1</u> and <u>Exhibit 2</u>, § 2(b).

131.   The Former Employees' Confidentiality Agreements were supported by adequate consideration, which included the Former Employees accepting the terms of the Confidentiality Agreements and their continued employment at Kimberly-Clark.

132.   The restrictive covenants in the Former Employees' Confidentiality Agreements were fair, reasonable, and necessary for the protection of Kimberly-Clark's legitimate business interests.

### Kimberly-Clark's Meltblown and Coform Trade Secrets Have Independent Economic Value

133.   Kimberly-Clark repeats and realleges paragraphs 1 through 132 as if fully set forth herein.

134.   The Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets derive independent economic value, actual and/or potential, from not being generally known to, and not being readily ascertainable through or by proper means by, another person who can obtain economic value from the disclosure or use of the information.

135.   The independent economic value of each of the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets is described in more detail in previous sections of this Complaint.

136.    The independent economic value of each of the Kimberly-Clark Coform Trade Secrets is further exemplified by the failed attempts of Kimberly-Clark's competitors to implement a commercial coforming manufacturing process as of the date of the filing of this Complaint, despite the strong economic incentives in doing so.

137.    Kimberly-Clark's Coform Trade Secrets and technology provides Kimberly-Clark with a unique product offering, unlike any other, which further helps Kimberly-Clark to maintain its leadership position in the baby wipes category.

## COUNT I – TRADE SECRET MISAPPROPRIATION UNDER DTSA
### (Against All Defendants)

138.    Kimberly-Clark repeats and realleges each and every allegation of paragraphs 1 through 137 as though fully set forth herein.

139.    Aspects of Kimberly-Clark's meltblown and coforming technology and research and development constitute protectable trade secrets.

140.    The Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets constitute protectable trade secrets under the DTSA.

141.    The Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets are not generally known to, and not readily ascertainable through proper means by, third parties.

142.   Kimberly-Clark took, and continues to take, reasonable measures to protect the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets and to keep them secret, including by having the Former Employees and other similarly-situated current and former employees agree to and execute Confidentiality Agreements and other similar non-competition agreements and confidentiality and proprietary information agreements, by sharing its trade secrets with a limited, restricted group of employees and trusted third parties necessary for the operation of Kimberly-Clark's business operations, and by further protections alleged herein.

143.   Kimberly-Clark has derived actual and potential independent economic value from the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets that have put Kimberly-Clark ahead of its competitors in the nonwoven materials industry, and expects to continue to derive further economic value from such trade secrets as Kimberly-Clark continues to use such trade secrets in its meltblowing and coforming manufacturing processes.

144.   Kimberly-Clark's Former Employees, Former Employee Cook and Former Employee Houston, collectively and individually, had access to, and did receive, during the course of their employment at Kimberly-Clark, the Kimberly-Clark Meltblown Trade Secrets.

145.    Kimberly-Clark's Former Employees, Former Employee Cook and Former Employee Houston, collectively and individually, had access to, and did receive, during the course of their employment at Kimberly-Clark, the Kimberly-Clark Coform Trade Secrets.

146.    Kimberly-Clark's Former Employees each had, and has, a continuing obligation under each of their Confidentiality Agreements to not disclose, publish or disseminate the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets, or use the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets for the benefit of any person or entity other than Kimberly-Clark, except as otherwise specifically authorized by Kimberly-Clark.

147.    The Former Employees, individually and/or collectively, disclosed published, and disseminated the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets, and used the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets for their own personal benefit and the benefit of Extrusion Group.  At the time of such disclosure and use, the Former Employees knew or had reason to know that knowledge of the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets was acquired under circumstances giving rise to a duty to maintain the

secrecy and limit the use of the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets.

148.   Extrusion Group acquired the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets, knowing or having reason to know that the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets were acquired by improper means, namely the Former Employees', including at least Former Employee Cook's and Former Employee Houston's, breach of the Former Employees' respective Confidentiality Agreements.

149.   Extrusion Group disclosed and used the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets, knowing or having reason to know that knowledge of the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets was derived from or through the Former Employees who owed a duty to Kimberly-Clark to maintain the secrecy and limit the use of the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets.

150.   The Former Employees and Extrusion Group have misappropriated, are currently misappropriating, and threaten to misappropriate in the future, the

Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets.

### *Misappropriation of the Kimberly-Clark Meltblown Trade Secrets*

151.   Kimberly-Clark repeats and realleges paragraphs 1 through 150 as if fully set forth herein.

152.   Kimberly-Clark obtained engineering drawings believed to be an Extrusion Group meltblown die ("EG Meltblown Die"), which are also believed to have been drawn by Former Employee Cook.[3]

153.   Extrusion Group, and/or employees of Extrusion Group, used information gained from its employees' prior employment at Kimberly-Clark when developing and/or designing the EG Meltblown Die.

154.   Kimberly-Clark believes that Extrusion Group sold the EG Meltblown Die to at least one manufacturer of nonwoven materials using meltblown technology in the United States.

155.   Extrusion Group made, used, sold, offered for sale, and/or exported the EG Meltblown Die, or a substantially similar meltblowing die, to at least Nanning.

---

[3]   Engineering drawings of the EG Meltblown Die obtained by Kimberly-Clark are attached as confidential exhibits to Kimberly-Clark's Motion for Limited Expedited Discovery, filed contemporaneously herewith.

156.    The EG Meltblown Die uses one or more of the Kimberly-Clark Meltblown Trade Secrets.

157.    The EG Meltblown Die makes use of the Kimberly-Clark Albury Die design and information derived from its development trade secrets.

158.    The EG Meltblown Die makes use of the Kimberly-Clark nozzle geometries trade secrets.

159.    The EG Meltblown Die makes use of the Kimberly-Clark die tip capillary geometries trade secrets.

160.    The EG Meltblown Die makes use of the Kimberly-Clark polymer distribution chamber trade secrets.

161.    The EG Meltblown Die makes use of other of the Kimberly-Clark Meltblown Trade Secrets.

162.    The Former Employees unlawfully disclosed one or more of the Kimberly-Clark Meltblown Trade Secrets to Extrusion Group.

163.    The Former Employees and Extrusion Group unlawfully disclosed and made use of one or more of the Kimberly-Clark Meltblown Trade Secrets in the making, using, selling, offering for sale and/or exporting the EG Meltblown Die and substantially similar meltblowing dies for and to Extrusion Group's

customers.  Such meltblowing dies are products used in, and intended for use in, interstate and foreign commerce.

164.   The Former Employees and Extrusion Group unlawfully disclosed and made use of one or more of the Kimberly-Clark Meltblown Trade Secrets in the making, using, selling, offering for sale, importing and/or exporting the EG Meltblown Die to the at least one manufacturer of nonwoven materials using meltblown technology in the United States.

165.   The Former Employees and Extrusion Group unlawfully disclosed and made use of one or more of the Kimberly-Clark Meltblown Trade Secrets in the making, using, selling, offering for sale, and/or exporting the EG Meltblown Die, or a substantially similar meltblowing die, to at least Nanning.

166.   The Former Employees and Extrusion Group have actually disclosed and used, and threaten to disclose and use, other of Kimberly-Clark's trade secrets relating to the manufacture of meltblown nonwoven materials, including, but not limited to, the Kimberly-Clark meltblowing manufacturing line process specifications and parameters trade secrets and other associated trade secret meltblown technologies.

167.   The Former Employees and Extrusion Group have actually disclosed and used, and threaten to disclose and use, other of Kimberly-Clark's trade secrets

relating to the manufacture of meltblown nonwoven fabrics during its contracted activities with at least Nanning.

### *Misappropriation of the Kimberly-Clark Coform Trade Secrets*

168.   Kimberly-Clark repeats and realleges paragraphs 1 through 167 as if fully set forth herein.

169.   Kimberly-Clark has obtained pilot line production samples of a coform nonwoven material from Nanning ("China Coform Samples").

170.   Nanning offered to sell to Kimberly-Clark coform nonwoven material, like that of the China Coform Samples.

171.   Nanning represented to Kimberly-Clark that the China Coform Samples were manufactured using coform process and services provided by Extrusion Group.

172.   Nanning hired and/or contracted Extrusion Group to build out a coforming manufacturing line in China.

173.   Nanning represented to Kimberly-Clark that it is building at least one coforming process manufacturing line in Nanning, China, and that it expects its first coforming process manufacturing line to start commercial production of coform nonwoven material in 2019.  Nanning represented to Kimberly-Clark that

Extrusion Group is its equipment supplier and engineering team hired to build out and implement its coforming manufacturing line in Nanning, China.

174.    Extrusion Group is Nanning's equipment supplier and engineering team hired to build out and/or implement Nanning's planned coforming manufacturing line in Nanning, China.

175.    Nanning represented to Kimberly-Clark that the target applications for the coform nonwoven materials to be manufactured at its coforming manufacturing line in Nanning, China, include wipes.

176.    Nanning represented to Kimberly-Clark that if market feedback on its coform nonwoven material is good, it has plans to build at least a second coforming process manufacturing line.

177.    Kimberly-Clark tested the China Coform Samples using microscopic and analytical testing.  The results of such testing indicate that the China Coform Samples were manufactured using a coform process.  The results of such testing further evidence that the China Coform Samples have substantial similarities in structure and composition as Kimberly-Clark's coform nonwoven material.

178.    Nanning identified to Kimberly-Clark the "machine effective width" of its future coforming process manufacturing line.  The machine effective width has a direct correlation to the Kimberly-Clark trade secret pulp sheet specifications

and trade secret Fiberizer assembly specifications.  Nanning's manufacturing line machine effective width is substantially the same as the machine effective width of Kimberly-Clark's coforming process manufacturing lines that use the Kimberly-Clark Coform Trade Secrets.

179.   Kimberly-Clark tested the formation index value of a 2018 China Coform Sample, which Kimberly-Clark received from Nanning in 2018 and which Nanning attributed to Extrusion Group.  Formation index values are a measurement of the uniformity of a nonwoven material.  A higher formation index value implies better formation quality.  Formation index tests of Nanning's 2018 Coform Sample yields results nearly identical with tests performed on Kimberly-Clark samples that make use of the Kimberly-Clark Coform Trade Secrets.

180.   The Former Employees and Extrusion Group unlawfully disclosed and used the Kimberly-Clark Coform Trade Secrets in the using, selling, offering for sale and exporting coforming processes and services for and to Extrusion Group's customers that employ the Kimberly-Clark Coform Trade Secrets.  Such coforming processes and services are services used in, and intended for use in, interstate and foreign commerce.

181.   Extrusion Group used, sold, offered for sale and/or exported coforming processes and services to and for at least Nanning.

182.   The Former Employees and Extrusion Group unlawfully disclosed and used the Kimberly-Clark Coform Trade Secrets in the using, selling, offering for sale, and exporting of coforming process and services to at least Nanning.

183.   The Former Employees and Extrusion Group have misappropriated the Kimberly-Clark Coform Trade Secrets by actually disclosing and using, and threatening to disclose and use, the Kimberly-Clark Coform Trade Secrets.

184.   The Former Employees and Extrusion Group have actually disclosed and used the Kimberly-Clark Coform Trade Secrets, and threaten to disclose and use the Kimberly-Clark Coform Trade Secrets, during its contracted activities with at least Nanning.

185.   The Former Employees and Extrusion Group have actually disclosed and used, and threaten to disclose and use, other of Kimberly-Clark's trade secrets relating to the manufacture of coform nonwoven fabrics.

186.   The Former Employees and Extrusion Group have actually disclosed and used, and threaten to disclose and use, other of Kimberly-Clark's trade secrets relating to the manufacture of coform nonwoven fabrics during its contracted activities with at least Nanning.

### *Other Considerations*

187.    Kimberly-Clark repeats and realleges paragraphs 1 through 186 as if fully set forth herein.

188.    Former Employee Houston was involved in the formation of each of defendants EG, EG Services, EG Global, and EG Ventures, and is the Chief Executive Officer of Extrusion Group.  Defendants EG, EG Services, EG Global, and EG Ventures, *i.e.*, "Extrusion Group," knew or should have known that the Former Employees were subject to their respective Confidentiality Agreements with Kimberly-Clark.  Despite this knowledge, Extrusion Group conspired with the Former Employees to engage in unfair and unlawful competition with Kimberly-Clark, namely, the unauthorized disclosure and misappropriation of the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets.

189.    Additional instances of actual and threatened misappropriation of the Kimberly-Clark Meltblown Trade Secrets, Kimberly-Clark Coform Trade Secrets, and/or other of Kimberly-Clark's proprietary and trade secret information likely will be discovered during the course of this action.

190.    The Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets are important to Kimberly-Clark's overall business and specifically its nonwoven materials business, and if these trade secrets and the

information behind them and how they were developed, tested, and implemented becomes generally known to Kimberly-Clark's competitors and others, Kimberly-Clark stands to suffer irreparable harm.

191.   Kimberly-Clark has no adequate remedy at law to protect against the actual and threatened misappropriation of the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets by the Former Employees and Extrusion Group.  Injunctive relief is, therefore, necessary and appropriate to restrain the misappropriation of such trade secrets pursuant to 18 U.S.C. § 1836(b)(3).

192.   Unless the Former Employees and Extrusion Group are restrained and enjoined from using Kimberly-Clark's trade secrets, Kimberly-Clark will suffer immediate and irreparable injury in that the Former Employees and Extrusion Group will continue to have access and the ability to disclose and make use of Kimberly-Clark's trade secrets, including the actual and threatened disclosure and use at Nanning, where such trade secrets are threatened to be replicated and widely disseminated throughout and among other Chinese nonwoven manufacturing facilities.

193.   As a direct and proximate result of Former Employees' and Extrusion Group's actual and threatened misappropriation of Kimberly-Clark's trade secrets,

Kimberly-Clark has further suffered damages in an amount yet to be determined. Former Employees and Extrusion Group also have been unjustly enriched. Pursuant to the DTSA, 18 U.S.C. § 1836(b)(3)(B)(i) and (ii), Kimberly-Clark is entitled to recover damages. Pursuant to the DTSA, 18 U.S.C. § 1836(b)(3)(C), by reason of Former Employees' and Extrusion Group's willful and malicious acts of misappropriation, Kimberly-Clark is entitled to an award of exemplary damages from Former Employees and Extrusion Group in such amounts as is necessary to punish Former Employees and Extrusion Group and deter them from commission of like acts. Kimberly-Clark seeks an award of exemplary damages in an amount two times the amount of the damages to be awarded under 18 U.S.C. § 1836(b)(3)(B). Pursuant to 18 U.S.C. § 1836(b)(3)(D), by reason of Former Employees' and Extrusion Group's willful and malicious misappropriation of Kimberly-Clark's trade secrets, Kimberly-Clark seeks an award of reasonable attorney's fees.

194.    Kimberly-Clark's claim herein under the DTSA is not barred by 18 U.S.C. § 1836(d). The Former Employees' and Extrusion Group's misappropriation of the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets was discovered by Kimberly-Clark within

the last three years, and the exercise of reasonable diligence did not, would not have, and should not have discovered such misappropriation.

## COUNT II – TRADE SECRET MISAPPROPRIATION UNDER GTSA
### (Against All Defendants)

195.    Kimberly-Clark repeats and realleges each and every allegation of paragraphs 1 through 194 as though fully set forth herein.

196.    Aspects of Kimberly-Clark's meltblown and coforming technology and research and development constitute protectable trade secrets.

197.    The Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets constitute protectable trade secrets under the GTSA.

198.    The Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets are not generally known to, and not readily ascertainable through proper means by, third parties.

199.    Kimberly-Clark took reasonable measures and efforts under the circumstances to protect Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets and keep them secret, including by having the Former Employees and other similarly situated current and former employees agree to and execute Confidentiality Agreements and other similar non-competition agreements and confidentiality and proprietary information agreements, sharing its trade secrets with a limited, restricted group of employees

and trusted third parties necessary for the operation of Kimberly-Clark's business operations, and as further alleged herein.

200.   Kimberly-Clark has derived actual and potential economic value from the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets that have put Kimberly-Clark ahead of its competitors in the nonwoven materials industry, and expects to continue to derive further economic value from such trade secrets as Kimberly-Clark continues to use such trade secrets in its meltblowing and coforming manufacturing processes.

201.   Kimberly-Clark's Former Employees and Extrusion Group have misappropriated, are currently misappropriating, and threaten to misappropriate in the future, the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets.

202.   The Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets are important to Kimberly-Clark's overall strategy and specifically its nonwoven materials business, and if these trade secrets and the information behind them and how they were developed, tested, and implemented becomes generally known to Kimberly-Clark's competitors and others, Kimberly-Clark stands to suffer irreparable harm.

203.   Kimberly-Clark has no adequate remedy at law to protect against the actual and threatened misappropriation of the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets by the Former Employees and Extrusion Group.  Injunctive relief is, therefore, necessary and appropriate to restrain the misappropriation of such trade secrets pursuant to O.C.G.A. § 10-1-762.

204.   Unless the Former Employees and Extrusion Group are restrained and enjoined from using Kimberly-Clark's trade secrets, Kimberly-Clark will suffer immediate and irreparable injury in that the Former Employees and Extrusion Group will continue to have access and the ability to disclose and make use of Kimberly-Clark's trade secrets, including the actual and threatened disclosure and use at Nanning, where such trade secrets are threatened to be replicated and widely disseminated throughout and among other Chinese nonwoven manufacturing facilities.

205.   As a direct and proximate result of Former Employees' and Extrusion Group's actual and threatened misappropriation of Kimberly-Clark's trade secrets, Kimberly-Clark has further suffered damages in an amount yet to be determined. Former Employees and Extrusion Group also have been unjustly enriched. Pursuant to the GTSA, O.C.G.A. § 10-1-763(a), Kimberly-Clark is entitled to

recover damages.  Pursuant to the GTSA, O.C.G.A. § 10-1-763(b), by reason of Former Employees' and Extrusion Group's willful and malicious acts of misappropriation, Kimberly-Clark is entitled to an award of exemplary damages from Former Employees and Extrusion Group.  Kimberly-Clark seeks an award of exemplary damages in an amount two times the amount of the damages to be awarded under O.C.G.A. § 10-1-763(a).  Pursuant to O.C.G.A. § 10-1-764, by reason of Former Employees' and Extrusion Group's willful and malicious misappropriation of Kimberly-Clark's trade secrets, Kimberly-Clark seeks an award of reasonable attorney's fees.

206.   Kimberly-Clark's claim herein under the GTSA is not barred by O.C.G.A. § 10-1-766.  The Former Employees' and Extrusion Group's misappropriation of the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets was discovered by Kimberly-Clark within the last five years, and the exercise of reasonable diligence did not, would not have, and should not have discovered such misappropriation.

## COUNT III – PATENT INFRINGEMENT ('534 PATENT)
### (Against Extrusion Group)

207.   Kimberly-Clark repeats and realleges each and every allegation of paragraphs 1 through 206 as though fully set forth herein.

208.   Nanning represented to Kimberly-Clark that the China Coform Samples were manufactured by Extrusion Group in the United States.

209.   Extrusion Group has manufactured coform nonwoven samples in the United States.

210.   Extrusion Group has manufactured coform nonwoven samples in the United States and provided such samples to Nanning.

211.   The China Coform Samples, and coform nonwoven material that is the same or substantially similar to the China Coform Sample, infringe the '534 Patent (collectively, "Infringing Coform Material").

212.   Extrusion Group made the China Coform Samples, and continues to manufacture coform nonwoven material that is the same or substantially similar to the China Coform Samples, in the United States.

213.   Extrusion Group offered for sale and/or sold the China Coform Samples and/or Infringing Coform Material to at least Nanning.

214.   Extrusion Group has been and is currently directly infringing at least claim 1 of the '534 Patent under 35 U.S.C. § 271(a) by making, using, offering to sell, and/or selling to EG Customers, directly or through intermediaries and/or subsidiaries, in this District and elsewhere within the United States, and/or importing into the United States, without authority, Infringing Coform Material,

including, but not limited to, the China Coform Samples, that satisfy all of the limitations of at least claim 1 of the '534 Patent.

215.    Kimberly-Clark tested the China Coform Samples using microscopic and analytical testing.  The results of such testing indicate that the China Coform Samples are a fibrous nonwoven structure that satisfy each and every limitation of at least claim 1 of the '534 Patent.

216.    The China Coform Samples are a fibrous nonwoven structure having a meltblown fibrous material and a secondary fibrous material (*i.e.*, wood pulp); the meltblown fibrous material has an average diameter of 4.82 μm, which is within the range of about 0.5 to 40 μm; the weight ratio of the secondary fibrous material to the meltblown fibrous material is 2.0, which is in between about 40/60 to about 90/10; the basis weight of the fibrous nonwoven structure is 61 gsm, which is within the range of about 20 gsm to about 500 gsm; and the formation index of the fibrous nonwoven structure is 73, which is greater than 70.

217.    Extrusion Group, and/or employees of Extrusion Group, used information gained from its employees' prior employment at Kimberly-Clark when developing a process for making the China Coform Samples and Infringing Coform Material.

218.   Extrusion Group has been and is currently directly infringing claim 28 of the '534 Patent under 35 U.S.C. § 271(a) by making, using, offering to sell, and/or selling, directly or through intermediaries and/or subsidiaries, in this District and elsewhere within the United States, without authority, a process of making Infringing Coform Material, including, but not limited to, the China Coform Samples, that satisfies all of the limitations of claim 28 of the '534 Patent.

219.   Extrusion Group made or had made a fibrous nonwoven structure (*i.e.*, the China Coform Samples and Infringing Coform Material) using a process of providing a first and second stream of meltblown fibrous materials having an average diameter of 4.82 μm, which is within the range of about 0.5 to 40 μm, extruded with meltblown dies and meeting at a formation zone; providing a third stream of natural fibers (*i.e.*, wood pulp) meeting the first and second stream of meltblown fibrous materials at the formation zone and thereby forming into a product stream; collecting the product stream on a forming wire as a mixture of meltblown fibrous materials and natural fibers.  The China Coform Samples (*i.e.*, the fibrous nonwoven structure) have a formation index of 73, which is within the range of between about 70 to 135.  The meltblown dies used in the process of making the China Coform Samples and Infringing Coform Material has a machine direction width of less than 16 cm.

220.   Extrusion Group has had knowledge of the '534 Patent at least as of the filing of this Complaint.

221.   To the extent Extrusion Group employs third-party manufacturers to make Infringing Coform Material, such third-party manufacturers also directly infringe at least claims 1 and 28 of the '534 Patent under 35 U.S.C. § 271(a), and Extrusion Group has thereby been and is currently indirectly infringing, by way of inducement with specific intent under 35 U.S.C. § 271(b), at least claims 1 and 28 of the '534 Patent.  Extrusion Group induces its third-party manufacturers to directly infringe at least claims 1 and 28 of the '534 Patent by making, using, offering to sell, and/or selling Infringing Coform Material, and performing the patented process of making such Infringing Coform Material, in this District and elsewhere in the United States and/or importing Infringing Coform Material into the United States.  Extrusion Group knows and continues to know that its third-party manufacturers are directly infringing at least one claim of the '534 Patent. Extrusion Group has demonstrated specific intent to encourage its third-party manufacturers to infringe the claims of the '534 Patent by providing designs and instructions for making the Infringing Coform Material.  These active steps, and other active steps to be uncovered during discovery in this action, performed in the United States and within this District, are taken to encourage direct infringement

and show an affirmative intent that its third-party manufacturers make Infringing Coform Material that infringe the '534 Patent.

222.    As a result of Extrusion Group's unlawful infringement of the '534 Patent, Kimberly-Clark has suffered and will continue to suffer damages in an amount to be proven at trial.  Kimberly-Clark is entitled to recover from Extrusion Group the damages adequate to compensate for such infringement in the form of both lost profits and a reasonable royalty, which have yet to be determined, together with interest and costs as fixed by the Court.

223.    Despite Extrusion Group's knowledge of the '534 Patent since at least the filing of this Complaint, and despite Extrusion Group's knowledge that it lacks a license to the '534 Patent, Extrusion Group nevertheless continues to directly infringe the '534 Patent under 35 U.S.C. § 271(a), and induce the infringement of the '534 Patent under 35 U.S.C. § 271(b), despite knowing that its actions and products directly and indirectly infringed and continue to infringe the '534 Patent. At a minimum, an objectively high likelihood exists that Extrusion Group's continued actions constitute infringement of the '534 Patent.  This infringement is known to Extrusion Group or is so obvious that Extrusion Group should have known about this infringement at least as of the filing of this Complaint.  Despite knowing that its actions constitute infringement of the '534 Patent and/or despite

knowing that that there is a high likelihood that its actions constitute infringement of the '534 Patent, Extrusion Group nevertheless continues its infringing actions, and continues to make, use, sell, offer for sale, import and provide components for its Infringing Coform Materials.

224.   Extrusion Group's continued infringement of the '534 Patent is thus deliberate and willful.

225.   Extrusion Group will continue to infringe the '534 Patent unless and until it is enjoined by this Court.

226.   Kimberly-Clark has been and continues to be irreparably harmed by Extrusion Group's infringement of the '534 Patent such that money damages cannot sufficiently compensate for such irreparable harm.  Unless injunctive relief is granted enjoining Extrusion Group and its agents, employees, representatives, affiliates, and all others acting in active concert therewith from infringing the '534 Patent, Kimberly-Clark will continue to be greatly and irreparably harmed.

227.   The '534 Patent is valid and enforceable.

## COUNT IV – BREACH OF CONTRACT
### (Against Former Employee Houston)

228.   Kimberly-Clark repeats and realleges each and every allegation of paragraphs 1 through 226 as though fully set forth herein.

229.   Former Employee Houston entered into a valid and binding Confidentiality Agreement with Kimberly-Clark Corporation (Exhibit 1).

230.   Kimberly-Clark performed all of its obligations to Former Employee Houston under the Confidentiality Agreement.

231.   Former Employee Houston's Confidentiality Agreement contains a valid and enforceable nondisclosure and confidentiality covenant, pursuant to which Former Employee Houston agreed that:

> The Company agrees to provide me with Company Information. ***In exchange for the Company's agreement to provide me with Company Information***, as well as the other mutual promises contained in this Agreement and access to its customers, ***I shall not disclose, publish or disseminate any Company Information, or use any Company Information for the benefit of any person or entity other than the Company, except as specifically required to perform my job duties for the Company or as otherwise specifically authorized by the Company***. I understand and agree that one of my important duties as an employee, and even after my employment terminate, regardless of the reason for or manner of termination, is to use my best efforts to safeguard the confidentiality of the Company Information. … ***With respect to Trade Secrets, my confidentiality obligations described herein shall continue even after my employment with the Company terminates (regardless of the reason for or manner of termination) and for so long as the information at issue remains a Trade Secret under applicable law***.

Exhibit 1, § 2(a) (emphases added).

232.   As defined in the Confidentiality Agreements, "Trade Secrets" is coextensive with trade secrets under the DTSA and GTSA.  *See* <u>Exhibit 1</u>, §§ 1(e), 1(g) ("Company Information" comprises "Trade Secrets"; *see* <u>Exhibit 1</u>, § 1(c)).

233.   As alleged above, Former Employee Houston disclosed, published and disseminated the Kimberly-Clark Meltblown Trade Secrets and/or the Kimberly-Clark Coform Trade Secrets, and used the Kimberly-Clark Meltblown Trade Secrets and/or the Kimberly-Clark Coform Trade Secrets for his own personal benefit and the benefit of Extrusion Group.  Such disclosure, publication, and dissemination of the Kimberly-Clark Meltblown Trade Secrets and/or the Kimberly-Clark Coform Trade Secrets was not required to perform the Former Employee Houston's job duties for Kimberly-Clark and was not authorized by Kimberly-Clark.

234.   Former Employee Houston's disclosure, publication, and dissemination of the Kimberly-Clark Meltblown Trade Secrets and/or the Kimberly-Clark Coform Trade Secrets was a breach by Former Employee Houston of his Confidentiality Agreement.

235.   Former Employee Houston's use of the Kimberly-Clark Meltblown Trade Secrets and/or the Kimberly-Clark Coform Trade Secrets for his own

personal benefit and the benefit of Extrusion Group was a breach by Former

Employee Houston of his Confidentiality Agreement.

236.   Former Employee Houston will continue to breach his Confidentiality

Agreement (Exhibit 1).

237.   Kimberly-Clark is damaged and will continue to be damaged and

irreparably harmed as a result of Former Employee Houston's breach of his

Confidentiality Agreement.

238.   To preserve Kimberly-Clark's rights to pursue any legal remedies that

might be necessary to avoid further harm that would result from disclosure of its

trade secrets, Former Employee Houston's Confidentiality Agreement contains a

valid and enforceable enforcement covenant, pursuant to which Former Employee

Houston agreed that:

> In the event of an anticipated or actual breach by me of Sections 2, 3 or 4, I acknowledge and agree that damages would not be an adequate remedy to compensate Kimberly-Clark for the harm to the business of the Company and, in such event, ***I agree that Kimberly-Clark shall be entitled to a temporary restraining order and to temporary injunctive relief to prevent or terminate such anticipated or actual breach***, provided, however, that nothing in this Agreement shall be construed to limit any permanent relief to which Kimberly-Clark may be entitled or the damages otherwise recoverable by Kimberly-Clark in any such event.

Exhibit 1, § 7(b) (emphasis added).

239.    Pursuant to the enforcement covenant of Former Employee Houston's Confidentiality Agreement, Former Employee Houston further agreed that:

> If I violate any aspect of this Agreement, or any duty of loyalty or confidentiality imposed by law, in addition to any damages that I may be required to pay, I understand and agree that I shall be required to reimburse the Company for all its costs incurred to enforce the Agreement, including … attorneys' fees.

Exhibit 1, § 7(c).

240.    Kimberly-Clark seeks, pursuant to the terms of the valid and enforceable Confidentiality Agreement (Exhibit 1) entered by and between Former Employee Houston and Kimberly-Clark Corporation, an injunction to prevent and terminate Former Employee Houston's anticipated and actual breach of his Confidentiality Agreement (Exhibit 1) and its attorneys' fees.  Kimberly-Clark further seeks damages in an amount to be determined at trial.

### COUNT V – BREACH OF CONTRACT
**(Against Former Employee Cook)**

241.    Kimberly-Clark repeats and realleges each and every allegation of paragraphs 1 through 239 as though fully set forth herein.

242.    Former Employee Cook entered into a valid and binding Confidentiality Agreement with Kimberly-Clark Corporation (Exhibit 2).

243.   Kimberly-Clark performed all of its obligations to Former Employee Cook under the Confidentiality Agreement.

244.   Former Employee Cook's Confidentiality Agreement contains a valid and enforceable nondisclosure and confidentiality covenant, pursuant to which Former Employee Cook agreed that:

> The Company agrees to provide me with Company Information.  ***In exchange for the Company's agreement to provide me with Company Information***, as well as the other mutual promises contained in this Agreement and access to its customers, ***I shall not disclose, publish or disseminate any Company Information, or use any Company Information for the benefit of any person or entity other than the Company, except as specifically required to perform my job duties for the Company or as otherwise specifically authorized by the Company***. I understand and agree that one of my important duties as an employee, and even after my employment terminate, regardless of the reason for or manner of termination, is to use my best efforts to safeguard the confidentiality of the Company Information. … ***With respect to Trade Secrets, my confidentiality obligations described herein shall continue even after my employment with the Company terminates (regardless of the reason for or manner of termination) and for so long as the information at issue remains a Trade Secret under applicable law***.

Exhibit 2, § 2(a) (emphases added).

245.   As defined in the Confidentiality Agreements, "Trade Secrets" is coextensive with trade secrets under the DTSA and GTSA.  *See* Exhibit 2, §§ 1(e), 1(g) ("Company Information" comprises "Trade Secrets"; *see* Exhibit 2, § 1(c)).

246.    As alleged above, Former Employee Cook disclosed, published and disseminated the Kimberly-Clark Meltblown Trade Secrets and/or the Kimberly-Clark Coform Trade Secrets, and used the Kimberly-Clark Meltblown Trade Secrets and/or the Kimberly-Clark Coform Trade Secrets for his own personal benefit and the benefit of Extrusion Group.  Such disclosure, publication, and dissemination of the Kimberly-Clark Meltblown Trade Secrets and/or the Kimberly-Clark Coform Trade Secrets was not required to perform the Former Employee Cook's job duties for Kimberly-Clark and was not authorized by Kimberly-Clark.

247.    Former Employee Cook's disclosure, publication, and dissemination of the Kimberly-Clark Meltblown Trade Secrets and/or the Kimberly-Clark Coform Trade Secrets was a breach by Former Employee Cook of his Confidentiality Agreement.

248.    Former Employee Cook's use of the Kimberly-Clark Meltblown Trade Secrets and/or the Kimberly-Clark Coform Trade Secrets for his own personal benefit and the benefit of Extrusion Group was a breach by Former Employee Cook of his Confidentiality Agreement.

249.    Former Employee Cook will continue to breach his Confidentiality Agreement (Exhibit 2).

250.    Kimberly-Clark is damaged and will continue to be damaged and irreparably harmed as a result of Former Employee Cook's breach of his Confidentiality Agreement.

251.    To preserve Kimberly-Clark's rights to pursue any legal remedies that might be necessary to avoid further harm that would result from disclosure of its trade secrets, Former Employee Cook's Confidentiality Agreement contains a valid and enforceable enforcement covenant, pursuant to which Former Employee Cook agreed that:

> In the event of an anticipated or actual breach by me of Sections 2, 3 or 4, I acknowledge and agree that damages would not be an adequate remedy to compensate Kimberly-Clark for the harm to the business of the Company and, in such event, *I agree that Kimberly-Clark shall be entitled to a temporary restraining order and to temporary injunctive relief to prevent or terminate such anticipated or actual breach*, provided, however, that nothing in this Agreement shall be construed to limit any permanent relief to which Kimberly-Clark may be entitled or the damages otherwise recoverable by Kimberly-Clark in any such event.

Exhibit 2, § 7(b) (emphasis added).

252.    Pursuant to the enforcement covenant of Former Employee Cook's Confidentiality Agreement, Former Employee Cook further agreed that:

> If I violate any aspect of this Agreement, or any duty of loyalty or confidentiality imposed by law, in addition to any damages that I may be required to pay, I understand and agree that I shall be required to

reimburse the Company for all its costs incurred to enforce the Agreement, including … attorneys' fees.

Exhibit 2, § 7(c).

253.   Kimberly-Clark seeks, pursuant to the terms of the valid and enforceable Confidentiality Agreement (Exhibit 2) entered by and between Former Employee Cook and Kimberly-Clark Corporation, an injunction to prevent and terminate Former Employee Cook's anticipated and actual breach of his Confidentiality Agreement (Exhibit 2) and its attorneys' fees.  Kimberly-Clark further seeks damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Kimberly-Clark respectfully requests this Court to:

(a)     Enter a preliminary injunction and, after trial, a permanent injunction, ordering Former Employee Houston to abide by the terms of his Confidentiality Agreement including, but not limited to:

  i.     Prohibiting Former Employee Houston from directly or indirectly using or disclosing Kimberly-Clark's trade secrets, including the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets; and

ii.     Prohibiting Former Employee Houston from directly or indirectly divulging or otherwise making any use of Kimberly-Clark's trade secrets, including the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets;

iii.    Ordering Former Employee Houston to certify, in writing, under the pains and penalties of perjury, that he has returned all of Kimberly-Clark's confidential, proprietary and trade secret information and no longer has any of Kimberly-Clark's confidential, proprietary and trade secret information in his possession, custody, or control;

(b)     Enter a preliminary injunction and, after trial, a permanent injunction, ordering Former Employee Cook to abide by the terms of his Confidentiality Agreement including, but not limited to:

i.      Prohibiting Former Employee Cook from directly or indirectly using or disclosing Kimberly-Clark's trade secrets, including the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets; and

ii.     Prohibiting Former Employee Cook from directly or indirectly divulging or otherwise making any use of Kimberly-Clark's trade

secrets, including the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets;

iii. Ordering Former Employee Cook to certify, in writing, under the pains and penalties of perjury, that he has returned all of Kimberly-Clark's confidential, proprietary and trade secret information and no longer has any of Kimberly-Clark's confidential, proprietary and trade secret information in his possession, custody, or control;

(c)   Enter a preliminary injunction and, after trial, a permanent injunction, ordering Extrusion Group to:

i. Cease and desist from acting in concert with, engaging in, tolerating willfully, acquiescing in, or accepting each and all of the Former Employees' violations of their Confidentiality Agreements with Kimberly-Clark;

ii. Cease and desist from directly or indirectly using or disclosing Kimberly-Clark's trade secrets, including the Kimberly-Clark Meltblown Trade Secrets and the Kimberly-Clark Coform Trade Secrets;

iii. Ordering Extrusion Group to certify, in writing, under the pains and penalties of perjury, that it has returned all of Kimberly-

Clark's confidential, proprietary and trade secret information and

no longer has any of Kimberly-Clark's confidential, proprietary

and trade secret information in its possession, custody, or control;

(d)     Enter a preliminary injunction and, after trial, a permanent injunction,

ordering all Defendants to:

    i.    Return to Kimberly-Clark any and all of Kimberly-Clark's

confidential, proprietary and trade secret information;

    ii.    Deliver to the Court for destruction any and all other documents

that contain or reflect Kimberly-Clark's confidential, proprietary

and trade secret information;

    iii.    Identify any Kimberly-Clark confidential, proprietary or trade

secret information that has been disclosed by anyone and the

names of any individual or entity to whom such disclosure was

made;

    iv.    Preserve and retain all documents and electronically stored

information potentially relevant to the claims raised in Kimberly-

Clark's Complaint;

    v.    Cease and desist all activities and disclosures to and with Nanning;

(e)     Enter a preliminary injunction and, after trial, a permanent injunction, enjoining Extrusion Group and its officers, directors, agents, servants, employees, affiliates, divisions, branches, subsidiaries, parents, and all others acting in concert or privity with any of them from infringing, or inducing the infringement of, the '534 Patent;

(f)     Enter a judgment against Former Employees and Extrusion Group and in favor of Kimberly-Clark on all Counts;

(g)     Enter a judgment finding that Extrusion Group has infringed, literally and/or under the doctrine of equivalents, at least one claim of the '534 Patent under 35 U.S.C. §§ 271(a) and 271(b);

(h)     Enter a judgment finding that Extrusion Group has willfully infringed at least one claim of the '534 Patent;

(i)     Enter a judgment finding that the '534 Patent is valid and enforceable;

(j)     Award Kimberly-Clark the damages to which it is entitled under 35 U.S.C. § 284 for Extrusion Group's past infringement and any continuing or future infringement of the '534 Patent up until the date Extrusion Group is finally and permanently enjoined from further infringement, including compensatory damages and the trebling of such damages due to the willful nature of the infringement;

(k)     Enter a judgment declaring this to be an exceptional case and awarding Kimberly-Clark attorneys' fees under 35 U.S.C. § 285;

(l)     Award Kimberly-Clark the damages to which it is entitled for the Former Employees' and Extrusion Group's misappropriation of Kimberly-Clark's trade secrets up until the date the Former Employees and Extrusion Group are finally and permanently enjoined from further misappropriation, including compensatory damages and exemplary damages, under both the DTSA and the GTSA;

(m)     Award Kimberly-Clark its attorneys' fees to which it is entitled for the Former Employees' and Extrusion Group's misappropriation of Kimberly-Clark's trade secrets under the DTSA and GTSA;

(n)     Award Kimberly-Clark its attorneys' fees to which it is entitled for the Former Employees' breach of their Confidentiality Agreements and pursuant to the terms of the Confidentiality Agreements;

(o)     Award Kimberly-Clark its costs and expenses in this action;

(p)     Award Kimberly-Clark pre- and post-judgment interest on its damages; and

(q)     Award such other and further relief as the Court deems just, proper and equitable.

## **JURY DEMAND**

254.   Kimberly-Clark hereby requests a trial by jury on all issues so triable.

Dated:  October 15, 2018.

OF COUNSEL:                                      /s/ *James A. Lamberth*

Mark Reiter (*pro hac to be filed*)             James A. Lamberth
Philip J. Spear (*pro hac to be filed*)         (Ga. Bar No. 431851)
GIBSON, DUNN & CRUTCHER LLP                     Puja Patel Lea
2100 McKinney Avenue #1100                      (Ga. Bar No. 320796)
Dallas, Texas 75201-6912                        TROUTMAN SANDERS LLP
(214) 698-3360                                  600 Peachtree Street, NE
mreiter@gibsondunn.com                          Suite 3000
pspear@gibsondunn.com                           Atlanta, GA 30308
                                                (404) 885-3362
R. Scott Roe (*pro hac to be filed*)            james.lamberth@troutman.com
GIBSON, DUNN & CRUTCHER LLP                     puja.lea@troutman.com
200 Park Avenue
New York, NY 10166-0193
(212) 351-2618
sroe@gibsondunn.com
                                                *Attorneys for Plaintiffs Kimberly-*
                                                *Clark Corporation and Kimberly-*
                                                *Clark Global Sales, LLC*