IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KIMBERLY-CLARK CORPORATION
and KIMBERLY-CLARK GLOBAL
SALES, LLC,
          *Plaintiffs*,

          *v.*

EXTRUSION GROUP, LLC;
EXTRUSION GROUP SERVICES LLC;
EG GLOBAL, LLC;
EG VENTURES, LLC;
MICHAEL HOUSTON; and
MICHAEL COOK,
          *Defendants*.

Civil Action File No.
1:18-cv-04754-SDG

## ORDER

This matter is before the Court on Plaintiffs' Motion for Sanctions [ECF 95]

and Defendants' Motion to Compel Responses to Interrogatories [ECF 106]. For

the reasons stated below, Plaintiffs' Motion for Sanctions is **GRANTED IN PART**

and **DENIED IN PART**; Defendants' Motion to Compel is **DENIED AS MOOT**.

## I.      BACKGROUND

This patent infringement and trade secrets case was initiated on October 15,

2018.[1] Plaintiffs assert claims for trade secret misappropriation, patent

_____

[1]    ECF 1.

infringement, and breach of contract.[2] On December 31, 2018, Plaintiffs served their document requests and first set of interrogatories on Defendants.[3] Defendants responded to these discovery requests on January 30, 2019.[4]

On April 24, 2019, Plaintiffs filed a motion for temporary restraining order.[5] They sought emergency injunctive relief to prevent Defendants from (among other things) exporting a manufacturing line to China that, Plaintiffs contend, misappropriated their trade secrets.[6] Plaintiffs also requested expedited briefing on the motion, which the Court granted.[7] On April 29, 2019, Defendants opposed the TRO motion.[8] On May 3, 2019, the Court held a hearing on the motion.[9]

The Court ultimately denied Plaintiffs' TRO motion on the grounds that Plaintiffs did not sufficiently establish a likelihood of success on the merits or that

---

[2]   *Id.*

[3]   ECF 62-7; ECF 62-8.

[4]   ECF 62-10; ECF 64-6 (filed under seal).

[5]   ECF 62.

[6]   *Id.*

[7]   ECF 61; ECF 66.

[8]   ECF 68 (filed under seal); ECF 73 (redacted).

[9]   ECF 84.

the injunction requested was necessary to prevent irreparable injury.[10] However, during the hearing the Court indicated that it was "extremely disturbed" by Defendants' responses to certain discovery requests.[11] It concluded "that certainly there appears to have been abuse of discovery by Defendant."[12] The Court ordered Defendants to make a supplemental production.[13] It also invited Plaintiffs to file a motion for sanctions addressing Defendants' apparent discovery abuse.[14] Plaintiffs' instant motion followed.[15] Defendants opposed the motion;[16] Plaintiffs filed a reply.[17]

Shortly after Plaintiffs filed their sanctions motion, Defendants filed a motion to compel of their own, arguing that Plaintiffs needed to provide more

---

10    *Id*. at 42–44; ECF 88.

11    ECF 84, at 44.

12    *Id*. at 42.

13    *Id*. at 46; ECF 89.

14    ECF 84, at 44.

15    ECF 95.

16    ECF 102.

17    ECF 128.

specificity in their interrogatory responses concerning Plaintiffs' trade secret claims.[18] Plaintiffs opposed this motion;[19] Defendants filed a reply.[20]

Both the motion for sanctions and the motion to compel were argued before the Court on November 20, 2019.[21] Pursuant to the Court's instructions from the bench, the parties conferred subsequent to the hearing and resolved Defendants' motion to compel.[22] Accordingly, that motion is now moot.

## II.     PLAINTIFFS' MOTION FOR SANCTIONS

### a.     Legal Standard

District courts have broad discretion to impose a broad range of sanctions under Fed. R. Civ. P. 37 for discovery abuses. *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005). The Court may order the payment of reasonable expenses, including attorney's fees, caused by the discovery violation, or impose any other sanction appropriate under the rule. Fed. R. Civ. P. 37(d). When imposing a sanction less severe than dismissal or default judgment, a court need

---

[18]   ECF 106.

[19]   ECF 125.

[20]   ECF 138.

[21]   ECF 168. Plaintiffs' motion for sanctions briefing can be found at ECF 95, 102, 109, 128, 133, and 140; Defendants' motion to compel briefing can be found at ECF 106, 125, 138, and 141.

[22]   ECF 179.

not find "willfulness or bad faith on the part of the disobedient party."

*BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045, 1049 (11th Cir. 1994).

In fact, it is the disobedient party that bears the burden to show that its conduct

was substantially justified or harmless in order to avoid sanctions. *Mitchell v. Ford*

*Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009); *Fanelli v. BMC Software, Inc.*,

No. 1:11-cv-436-LMM, 2015 WL 13122473, at \*2–3 (N.D. Ga. Apr. 29, 2015).

    **b.**    **Discussion**

        **i.**    **Defendants' Interrogatory Response & the Parties' Conferral Process**

Plaintiffs' first interrogatory stated:

> Identify the location or locations of any and all of Your Equipment, Manufacturing Lines, Manufacturing Processes, and Products; if You do not presently have, own, operate, lease or otherwise exercise any control over any Equipment, Manufacturing Lines, Manufacturing Processes, or Products, identify from whom you purchase Meltblown and/or Coforming material and state the earliest date that You expect to have, own, operate, lease or otherwise exercise any control over Equipment, Manufacturing Lines, Manufacturing Processes, or Products.[23]

---

[23]    ECF 62-8, at 9.

The Interrogatories defined "Equipment" to include "Meltblowing equipment" and "Coforming equipment" (with each such term itself separately and explicitly defined), as well as the "components and assembly thereof."[24]

Defendants asserted both general and specific objections to Interrogatory 1, including that it exceeded the scope of the case, was overly broad, and caused undue burden.[25] More generally, Defendants objected to the definition of the term "Equipment" as "vague, ambiguous, overly broad, and unduly burdensome at least for the reason that *it purports to include and/or conflate physical machinery with* designs for such machinery and/or *component parts of physical machinery*."[26] However, Defendants also provided a verified response to Interrogatory 1, stating that Extrusion Group "does not presently have or own any Equipment, Manufacturing Lines, Manufacturing Processes, or Products. . . . Answering further, EG states that it anticipates it will exercise temporary control over Equipment designed and manufactured for Qiaohong in the first or second quarter of 2019."[27] Defendants continued to ratify their response during multiple

---

[24]   *Id*. at 4–6.

[25]   ECF 102, at 12.

[26]   *Id*. (quoting General Objection 20 to Interrogatories).

[27]   *Id*. at 12. "Extrusion Group" and "EG" refer to the corporate Defendants.

meet-and-confer sessions among counsel that took place between January 30 and March 29, 2019.[28]

In truth, at the time Defendants' interrogatory response was verified and served, Defendants *did* have and own substantial amounts of Equipment as defined in the Interrogatories.[29] By mid-March 2019, only six weeks after Defendants served their verified interrogatory response disclaiming possession of any items responsive to Plaintiffs' request, Defendants produced a *completed* Manufacturing Line (as defined in the Interrogatories) for inspection to a Chinese customer.[30]

During the November 20, 2019 oral argument, Plaintiffs showed a time-lapse video concerning the construction of the Manufacturing Line from before, during, and after January 30, 2019, when Defendants served their verified interrogatory responses. The timeframe of the video also spanned the period during which the parties had engaged in multiple meet-and-confer sessions.[31] During an April 8, 2019 inspection of Defendants' facility, Plaintiffs found several

---

[28]   ECF 62-1, at 9–10; ECF 62-4, ¶¶ 37–44.

[29]   ECF 178, at 20.

[30]   *Id.*

[31]   *Id.* at 20–25.

binders containing "Equipment" designs that were undoubtedly responsive to previous discovery requests but that had never been produced.[32]

### ii. Defendants Unilaterally Narrowed Plaintiffs' Discovery Requests.

Through their objections, Defendants unilaterally narrowed the definitions in and scope of Plaintiffs' discovery requests and failed to disclose that information was being withheld on that basis.[33]

While Defendants' objections may have been meritorious, they never sought a protective order. Fed. R. Civ. P. 37(d)(2) (failure to disclose is not excused on ground that discovery sought is objectionable absent pending motion for protective order); *Fudali v. Pivotal Corp.*, No. 1:10-cv-943-RWS-SSC, 2010 WL 11598056, at *9 (N.D. Ga. Dec. 21, 2010) (noting that failure to respond to discovery "is not excused on the ground that the discovery was objectionable"). If anything, Defendants' objections gave Plaintiffs the impression during multiple meet-and-confer sessions that information had *not* been withheld.[34]

---

[32]   *Id*. at 24; *see also* ECF 62-4, ¶ 48.

[33]   ECF 102, at 13–17.

[34]   ECF 178, at 23–24.

### iii.      Analysis

There is no doubt that Defendants were, at best, not completely candid in their responses to Plaintiffs' discovery requests and in subsequent meet-and-confer sessions. It simply belies common sense that Defendants' counsel, as experienced and capable as they are, would not have recognized their discovery obligations and the need for Defendants to be more forthcoming in their disclosures. To the extent counsel was not provided complete information by Defendants, it is counsels' duty to ensure that their clients understand and comply with discovery obligations. Fed. R. Civ. P. 26(g)(1).

To their credit, Defendants' counsel now acknowledge that Defendants' responses to discovery "could have been clearer," and that Defendants could have supplemented the interrogatory responses in late February or early March as the Manufacturing Line came together and was being assembled.[35] That is because, even under Defendants' unilaterally narrowed definition of the information and materials responsive to Plaintiffs' discovery requests, the items in Defendants' possession by late February or early March were undoubtedly responsive. The Court appreciates counsel's candor in this regard because it mitigates against the

---

[35]   ECF 102, at 6, 15.

need to sanction Defendants as a specific deterrent against future violations. Despite that candor, however, the Court concludes Defendants have not satisfied their burden of demonstrating the substantial justification for or harmlessness of their discovery violations. Accordingly, the Court concludes that some degree of sanction, as requested by Plaintiffs, is appropriate.

### c.   Remedy

Plaintiffs request a host of remedies for Defendants' sanctionable conduct, including payment of over $400,000 in attorneys' fees and expenses, as well as a determination that Defendants categorically waived privilege over their communications with counsel concerning certain subject matters.[36] The Court finds the totality of Plaintiffs' requests disproportionate to the severity of the violation and the harm caused by it.

With regard to Plaintiffs' requests for the payment of attorneys' fees and expenses, Plaintiffs seek reimbursement for their (1) physical inspection of Defendants' facilities; (2) preparation of the motion for a temporary restraining order and subsequent hearing; and (3) preparation of the instant motion for sanctions.[37]

---

[36]   ECF 95-1, at 25–28.

[37]   *Id*. at 15.

The appropriate framework is as follows:

> In calculating a reasonable award of attorneys' fees, a district court must first calculate the "lodestar" amount—the number of hours reasonably expended multiplied by a reasonable hourly rate. A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation. The district court is itself an expert on the reasonableness of hourly rates and may consider its own knowledge and experience on the topic. Further, the fee applicant must provide the district court with detailed evidence about the reasonable hourly rate, as well as records to show the time spent on the different claims and the general subject matter of the time expenditures set out with particularity. In addition, a well-prepared fee petition also would include a summary, grouping the time entries by the nature of the activity or stage of the case.

*Dial HD, Inc. v. ClearOne Commc'ns*, 536 F. App'x 927, 930–31 (11th Cir. 2013) (internal quotation marks omitted) (citations omitted).

### i.       Plaintiffs' Inspection of Defendants' Facilities

Plaintiffs argue that Defendants should be made to pay for Plaintiffs' inspection of Defendants' facilities because "only through the inspection did [Plaintiffs] learn the extent of Defendants' discovery misrepresentations and the concealment of equipment, materials, and documentation Defendants had in their

possession."[38] Plaintiffs request that fifty percent of their fees and expenses incurred, $13,003.50, be reimbursed.[39]

The Court agrees that Plaintiffs' request in this regard is reasonable, proportional, and causally related to Defendants' discovery violations. But for Plaintiffs' fortuitous discovery request to inspect Defendants' facilities, it is probable that Defendants' discovery violations would not have been uncovered, at all or at least not to the extent that they were at this stage of the litigation.[40] The Court has reviewed the timekeeper rates of the four professionals (two partners, one associate, one paralegal) who billed time to the inspection of Defendants' facilities.[41] Based on the Court's own experience and familiarity with the legal market in this District, the Court finds that the timekeepers' rates are within the average billable rates for similar services by lawyers of reasonably comparable skills, experience, and reputation. The Court further finds that the amount of time expended by the timekeepers on the various tasks, including the expenses borne

---

[38]   *Id.* at 17.

[39]   ECF 95-2, at 8.

[40]   ECF 95-1, at 17–18.

[41]   ECF 96-1, at 8.

by Plaintiffs' expert witness in connection with the inspection, are reasonable and

proportional, particularly given the fifty percent discount suggested by Plaintiffs.

For these reasons, Plaintiffs are awarded $13,003.50 in connection with their

inspection of Defendants' facilities, which the Court finds was expended as a result

of Defendants' discovery violations.

### ii.   Plaintiffs' Preparation of Motion for Temporary Restraining Order and Subsequent Hearing

Plaintiffs seek $291,764.47 in fees and costs incurred for preparing their

Motion for Temporary Restraining Order and the subsequent hearing on that

motion.[42] They argue that reimbursement is warranted because the motion was

predicated "on an adverse inference that Defendants' designs incorporated

[Plaintiffs'] intellectual property based on Defendants' repeated and numerous

discovery misrepresentations."[43]

The Court does not agree that there is a causal connection between

Defendants' discovery violations and Plaintiffs' TRO motion. Even if Defendants

had been completely forthcoming from the outset with their discovery responses,

the Court is reasonably confident that Plaintiffs would have sought a temporary

---

[42]   ECF 95-1, at 18–19, 28.

[43]   *Id*. at 18.

restraining order in any event. And, although the subsequent hearing before the Court on the TRO motion substantially focused on the veracity of Defendants' discovery responses, there is insufficient evidence for the Court to find that its ultimate holding would have been any different. That is, even in the absence of any discovery violations, Plaintiffs' motion for a TRO would likely have been denied for the same reasons—on the grounds that Plaintiffs did not sufficiently establish (1) a likelihood of success on the merits or (2) that the relief requested was necessary to prevent irreparable injury.[44]

### iii.    Plaintiffs' Preparation of Motion for Sanctions

In contrast to Plaintiffs' TRO motion and subsequent hearing, there can be no debate that Defendants' discovery violations required Plaintiffs to incur fees and costs in bringing their sanctions motion. Plaintiffs request reimbursement of $66,932.00 of their fees and costs in this regard.[45]

The Court has reviewed the timekeeper rates of the six professionals (two partners, three associates, one paralegal) who billed time to the sanctions motion.[46] As referenced above, based on its own experience and familiarity with

---

[44]   ECF 84, at 42–44.

[45]   ECF 95-1, at 19, 27.

[46]   ECF 96-1, at 9.

the legal market in this District, the Court finds that the timekeepers' rates are within the average billable rates for similar services by lawyers of reasonably comparable skills, experience, and reputation.

The Court further finds that the amount of time expended by the timekeepers on the various tasks are generally reasonable and proportional, with some exceptions. First, the Court observed that the time billed by the paralegal on May 14 and 15, 2019, pertained more to working with the firm's e-discovery team on reviewing and organizing Defendants' supplemental discovery production (as ordered by the Court during the TRO motion hearing) than it did in furtherance of Plaintiffs' sanctions motion.[47] The Court understands that Defendants' supplemental discovery production forms the basis in part for Plaintiffs' request for sanctions, but finds that these time entries likely would have been incurred even if Plaintiffs had elected to not move for sanctions. Thus, 2.2 hours of the paralegal's time will not be awarded.

The Court is also of the view that having five attorneys from four different office locations work on a single motion for sanctions may have been excessive or created unnecessarily duplicative work, notwithstanding the fact that discrete

---

[47]   ECF 96-4, at 7.

portions of the motion and/or supporting declarations were assigned to each attorney.[48] Rather than parsing out the individual time entries for potential excessiveness or duplication, however, the Court concludes that awarding these fees and costs in total is reasonably balanced by the fact that Plaintiffs plainly incurred substantial fees and costs in connection with the Court's hearing on November 20, 2019, where a substantial amount of the time was devoted to oral argument on Plaintiffs' sanctions motion.[49] Plaintiffs have not sought to supplement their fees and costs reimbursement request in connection with their preparation for and attendance at the November 20 hearing, although they could have done so. Accordingly, Plaintiffs are awarded $66,184.00 in connection with their preparation of the instant Motion for Sanctions.

However, the Court denies Plaintiffs' request for reimbursement of their local counsel fees and costs in its entirety, which totals $31,198.50.[50] The decision by Plaintiffs to retain out-of-state counsel (which is certainly within their right) necessarily creates certain inefficiencies and duplication of work that, in the Court's view, should not be borne by Defendants as part of a sanctions award. The

---

[48]   *Id.* at 2–6.

[49]   ECF 168.

[50]   ECF 95-1, at 28.

Court finds that not awarding fees and costs for local counsel also effectively discounts whatever duplication and excessiveness may exist in the billable time entries for the preparation of the sanctions motion that are being awarded to Plaintiffs.

Likewise, Defendants no doubt incurred substantial fees and costs of their own in connection with defending Plaintiffs' sanctions motion, both in drafting their written submissions, as well as preparing for and attending the November 20 hearing. This, too, effectively operates as a financial sanction for Defendants' discovery violations.

### iv.      Privilege Waiver

Finally, Plaintiffs seek a determination that Defendants waived privilege by relying on attorney-client communications as a "sword" in this litigation.[51] *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1417 (11th Cir.), *opinion modified on reh'g*, 30 F.3d 1347 (11th Cir. 1994). Specifically, they argue that Defendants waived privilege by submitting the Declaration of Kurtis Brown, the President of Extrusion Group, in support of their opposition to Plaintiffs' TRO motion.[52] In his Declaration, Mr. Brown testified "[i]t is my further understanding that Extrusion

---

[51]   *Id*. at 20–24.

[52]   *Id*.

Group and its counsel understood that the term 'Equipment' and the other capitalized phrases [Plaintiffs] defined in [Plaintiffs'] discovery meant complete Equipment, as opposed to, for example, unassembled component parts of equipment."[53]

The Court finds that Defendants did not waive privilege, expressly or by implication, through their use of the Brown Declaration. Mr. Brown did not testify about or reveal the substance of any attorney-client communication. Nor did he place at issue a privileged communication that goes to the heart of a claim or defense. *Liberty Mut. Fire Ins. Co. v. APAC-Southeast, Inc.*, No. 1:07-CV-1516-JEC, 2008 WL 113220055, at *5–6 (N.D. Ga. May 16, 2008). He simply recounted his "understanding" of what, in turn, Defendants and their counsel "understood" concerning the meaning of certain terms in Plaintiffs' discovery requests. It is no surprise to the Court that counsel would be involved, oftentimes substantially so, in preparing written discovery responses on behalf of a party. Doing so does not necessarily waive the privilege in every instance where a party representative is subsequently tasked with explaining the reasoning behind the party's responses to discovery requests.

---

[53]   ECF 75, ¶ 3 (filed under seal). The Court finds that this portion of the sealed filing does not require confidentiality.

Nor is it appropriate for the Court here, as Plaintiffs alternatively request, to categorically waive Defendants' attorney-client privilege over certain communications as a means to "punish" Defendants and avoid a "protracted debate over the scope of this waiver."[54] First, as discussed above, the Court finds that there was no affirmative waiver of privilege by Defendants. Second, waiving privilege over certain categories of communications as a sanction for discovery violations that have nothing to do with the assertion of privilege would be an unfairly draconian remedy that is disproportional to the discovery violations at hand. In sum, it's a bridge too far that the Court is unwilling to cross.

## III.   CONCLUSION

Plaintiffs' Motion for Sanctions [ECF 95] is **GRANTED IN PART** and **DENIED IN PART.** Defendants shall pay Plaintiffs a total of $79,187.50 within 60 days of this Order. Defendants' Motion to Compel Responses to Interrogatories [ECF 106] is **DENIED AS MOOT**.

**SO ORDERED** this the 2nd day of April 2020.

_____
Steven D. Grimberg
United States District Court Judge

---

[54]   ECF 95-1, at 24–25.